IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

CHAD YOUTH ENHANCEMENT )
CENTER, INC. )
    )
and )
    )
UNIVERSAL HEALTH SERVICES, INC. )
    )
    Plaintiffs, )   Civil Action No. 3:09cv0545
    )   District Judge Echols
    v. )   Magistrate Judge Brown
    )
COLONY NATIONAL INSURANCE CO. )
    )
    Defendant. )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR AWARD OF ATTORNEY'S FEES

This Memorandum is submitted on behalf of plaintiffs Chad Youth Enhancement Center ("Chad") and Universal Health Services, Inc. ("UHS" and collectively with Chad "Plaintiffs") in support of their contemporaneously filed Motion for Award of Attorney's Fees (the "Motion"). For the reasons set forth below, the Motion should be granted.

### I.   STATEMENT OF FACTS

#### A.   The Proceedings In This Action

This case involved a claim by Plaintiffs for coverage from defendant Colony National Insurance Company ("Colony") under a second level excess policy (the "Policy") that was issued to Plaintiffs by Colony for coverage in a lawsuit filed by Paulette M. Dolby ("Dolby") against Plaintiffs in the United States District Court for the Eastern District of Pennsylvania (the "Eastern District") captioned <u>Paulette M. Dolby as</u>

the administratrix of the Estate of Omega Leach, III vs. Universal Health Services, Inc., et al. (the "Dolby action").

UHS is a hospital management company that, through its affiliates, owns and manages health care facilities throughout the United States. Chad is a wholly owned subsidiary of UHS which owned and operated a behavioral health center located in Ashland City, Tennessee (the "Chad facility"). Dolby sought damages from the Plaintiffs as a result of alleged negligence in early June 2007 that purportedly resulted in the death of Omega Leach, III ("Leach") while he was a resident at the Chad facility. Dolby claimed that Leach was "strangled" by one or more employees of Chad during an incident at the Chad facility that occurred when Leach resisted efforts by Chad employees to require him to follow the rules of the facility governing the behavior of residents. Dolby sought compensatory and punitive damages from Plaintiffs.

The Policy provides $10 million in coverage in excess of: (a) a $500,000 self-insured retention; (b) a primary level policy with General Star Insurance Company ("General Star") with limits of $1 million; and (c) a first level excess policy with Axis Insurance Company ("Axis") with limits of $5 million. Although General Star and Axis immediately confirmed coverage to the Plaintiffs for the Dolby action, Colony refused to do so, thereby making it exceedingly difficult to attempt to settle the Dolby action.

Colony asserted that the Policy did not cover punitive damages even though: (a) the Policy expressly incorporated the terms and conditions of the "underlying insurance," a term that was defined to mean the terms and conditions of both the Axis policy **and** the General Star policy; and (b) the General Star policy provided coverage for punitive damages. Plaintiffs explained to Colony that, given the foregoing policy

language, the Policy clearly and unambiguously covered punitive damages, or, at best, it was ambiguous as to coverage for punitive damages, and, thus, the Policy must be construed in favor of the Plaintiffs so as to provide such coverage. Nevertheless, Colony persisted in its position that the Policy excluded coverage for punitive damages.

Colony also took the position that, even if the Policy covered punitive damages, it would be against public policy to provide such coverage. It took this position even though the Policy is governed by Tennessee law and it is not against Tennessee public policy to provide coverage for punitive damages. As to the fact that the Policy is governed by Tennessee law, Plaintiffs pointed out to Colony that: (a) the Policy expressly provides on the declarations page that the "Named Insured" to whom it was being issued was "UHS Children Services, Inc., 3401 West End Ave., Suite 400, Nashville, TN 37203;" (b) the Policy was "issued and delivered as surplus lines coverage pursuant to the Tennessee insurance statutes;" and (c) a Tennessee surplus lines tax of $7,875 was paid in connection with the issuance of the Policy. As to the fact that it is not against Tennessee public policy to provide coverage for punitive damages, Plaintiffs pointed Colony to the decision of the Tennessee Supreme Court in the seminal case of <u>Lazenby v. Universal Underwriter Insur. Co.</u>, 383 S.W.2d 1 (1964). Nevertheless, Colony persisted in its public policy argument.

Colony's adamant coverage position, which, as noted, was a fundamental impediment to any effort to amicably resolve the Dolby action, compelled Plaintiffs to file this coverage action.

Once it learned about this action, Colony sought to avoid having the Policy construed under Tennessee law by filing a separate insurance coverage action in the

Eastern District of Pennsylvania, which filing compelled Plaintiffs to file a motion to dismiss that action. After briefing and argument, the Plaintiffs' motion in the Eastern District was granted, and the Colony action was dismissed. Colony never sought to appeal the dismissal of the Pennsylvania action to the U.S. Court of Appeals for the Third Circuit.

Colony also filed a motion to transfer this action to the Eastern District of Pennsylvania as well as a motion to dismiss the count in Plaintiffs' complaint in this action which asserted a claim for damages under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* (the "Act").

Moreover, Colony then failed to file its opposition to Plaintiffs' motion for summary judgment in accordance with this Court's scheduling order, but, instead, advised Plaintiffs that it planned to take over a dozen depositions and that it would file its opposition to the summary judgment motion, as well as a cross motion for summary judgment, when such discovery was completed. This action required Plaintiffs to raise the matter with Magistrate Judge Brown, including filing papers that explained why there was no support for Colony's unilateral effort to alter the briefing schedule on Plaintiffs' summary judgment motion. After telephonic argument, Colony was given additional time within which to file papers on the fundamental coverage issue raised in this action: whether the Policy provided coverage for punitive damages.

On February 2, 2010, following full briefing of the parties' respective motions for summary judgment on the issue of whether the Policy covered punitive damages, as well Colony's motions to transfer this action and to dismiss Plaintiffs' claim against Colony under the Act, the Court entered a Order and an accompanying Memorandum

(the "February 2 Order") granting Plaintiffs' motion for partial summary judgment, denying Colony's cross-motion for partial summary judgment, denying Colony's motion to transfer this action to the Eastern District and denying Colony's motion to dismiss Plaintiffs' claim under the Act.

On April 1, 2010, Colony filed a Motion for Reconsideration of the February 2 Order that fails to bring to the attention of the Court any new or different authorities than previously relied on by Colony, but merely repeats arguments already made at length. Based on such repetitious argument, Colony contends that the Court allegedly made "clear legal error" in its rulings on the parties' summary judgment motions.

Colony argues, in the alternative, that the Court should certify the summary judgment ruling under Fed. R. Civ. P. 54(b). Plaintiffs' position is that certification is inappropriate because there is an additional matter that must be resolved in this Court – the attorney's fee issues presented by this motion. Once this matter has been resolved, the Court can enter a final judgment from which Colony may take an appeal as of right. Accordingly, there is no basis for issuing a Rule 54(b) certification.

## B. The Resolution Of The Dolby Action

Under the close supervision of U.S. District Court Judge Mitchell Goldberg of the Eastern District of Pennsylvania, the parties in the Dolby action conducted discussions during 2009 aimed at settling that action. As noted, both General Star and Axis made their policy limits, which totaled $6 million, available for a settlement. Negotiations involved two separate but related tracks. It was, of course, necessary to reach a

resolution with Dolby. However, given Colony's position, a protracted and difficult negotiation with Colony was also necessary.

Plaintiffs and Colony ultimately agreed -- after each party had separate conversations with Judge Goldberg – that: (a) if Plaintiffs prevailed on their motion for partial summary judgment in this action on the issue of whether the Policy covered punitive damages, Colony would agree to pay Plaintiffs' reasonable attorney's fees incurred in connection with this action without Plaintiffs being required to establish that they were entitled to attorney's fees under the Act; and (b) in that event, Plaintiffs would not seek to obtain any other damages that might be available to them under the Act.

While Colony may contend that there are other aspects of the settlement agreement between Colony and Plaintiffs that are memorialized in correspondence between the parties, any such correspondence does not in any way alter or modify Colony's agreement to pay Plaintiffs' reasonable counsel fees upon a ruling on the then-pending cross motions for summary judgment in this case regarding whether the Policy covered punitive damages. That essential term of the agreement between the Parties is set forth in a February 4, 2010 letter from Judge Goldberg to the Parties and to counsel in the Dolby action (the "February 4 letter"). A redacted version of the February 4 letter, which contains the relevant agreement regarding an award of attorneys' fees to Plaintiffs in this matter, is attached hereto as **Exhibit A**.[1]

---

[1] Plaintiffs do not feel that there is any dispute concerning Colony's agreement to pay Plaintiffs' attorney's fees in this action. Should Colony take the position that it has not so agreed, however, or should the Court wish to review the actual Agreement, Plaintiffs can submit the Agreement for the Court's inspection *in camera*.

## II. __ARGUMENT__

### A. __Under The Express Agreement With Colony, Plaintiffs Are Entitled To An Award Of Reasonable Attorney's Fees__

It has long been the general rule in the United States that a prevailing party may recover attorney's fees if provided for by statute or if there is an enforceable contract providing for a fee award. This "American Rule" regarding attorney fees was adopted by the United States Supreme Court in <u>Arcambel v. Wiseman</u>, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796), and has been reaffirmed numerous times by the Supreme Court. <u>See, e.g.</u>, <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983); <u>Summit Valley Industries v. Local 112, United Brotherhood of Carpenters</u>, 456 U.S. 717 (1982); <u>Alyeska Pipeline Service Co. v. Wilderness Society</u>, 421 U.S. 240 (1975). Tennessee follows the American Rule, as it is a well-established principle under Tennessee law that an award of attorney's fees is an appropriate element of damages if such an award is *specifically or expressly* provided for by contract or by statute. <u>See, e.g., Cracker Barrell Old Country Store, Inc. v. Epperson,</u> 284 S.W.3d 303 (Tenn. 2009); <u>State v. Brown & Williamson Tobacco Co.</u>, 18 S.W.3d 186 (Tenn. 2000); <u>John Kohl & Co. v. Dearborn & Ewing,</u> 977 S.W.29 528 (Tenn. 1998).

In the instant case, there is an agreement between the parties which *expressly* provides for Plaintiffs to recover their attorney's fees after they prevailed on their summary judgment motion. <u>See</u> Exhibit A. An award of reasonable attorney's fees is therefore appropriate.

**B.** **An Award Of Reasonable Attorney's Fees Is Consistent With The Tennessee Consumer Protection Act**

Plaintiffs have made a claim for attorney's fees under the Act, which permits a court to award reasonable attorney's fees against a defendant found to have violated the Act. Pursuant to Section 47-18-109(e)(1), "upon a finding by the Court that a provisions of this part has been violated, the Court may award to the person bringing such action reasonable attorney's fees and costs." While Colony has agreed that Plaintiffs are entitled to recover reasonable attorney's fees without being required to prove their entitlement under the Act, cases awarding attorney's fees under the Act are nevertheless instructive.

Tennessee courts have not hesitated to award attorney's fees under the Act. See Reed v. Wally Conard Construction, Inc., 1999 WL 817528 at *8 (Tenn. Ct. App. Oct. 13, 1991) (**Exhibit B**) (award of attorney's fees to the plaintiff-insured affirmed even in the absence of documentation to support the amount of time the attorney claimed he had spent on the case). In Dixon v. Bryan, 1998 WL 867257 (Tenn. Ct. App. Dec. 15, 1998) (**Exhibit C**), in affirming the trial court's award of attorney's fees to the prevailing party under the Act, the Court of Appeals wrote:

> The Consumer Protection Act, enacted in 1977, is "to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." Dorris v. Mack's Used Cars, 824 S.W.2n 538, 540 (Tenn. 1992) (citing) Hanerlah v. Memphis Aviation, Inc., 675 S.W.2d 297, 305 (Tenn. App. 1985). Persons harmed as a result of "an unfair or deceptive act or practice declared to be unlawful" by the Act may recover actual damages. Tenn. Code Ann. § 47-18-109(a)(1)(1996). The trial court may also award attorney's fees. Id. § 47-18-109(e)(1).

Id. at *2. The Dixon court also noted that an award of attorney's fees is appropriate even absent proof that the defendant acted willfully or knowingly.

Other Tennessee cases are to the same effect. <u>See</u> <u>e.g.</u> <u>Leake v. Airport Toyota</u> <u>of Memphis, Inc.</u>, 1993 WL 360443 at *5 (Tenn. Ct. App. Sept. 14, 1993) (**Exhibit D**) (the appellate court not only affirmed the trial court's award of attorney's fees under the Act but also remanded the case for an award of attorney's fees incurred on appeal); <u>Ramey v. Kingsport Motors, Inc.</u>, 1992 WL 63443 at *2 (Tenn. Ct. App. April 1, 1992) (**Exhibit E**) (affirming award of attorney's fees and reiterating that a knowing or willful violation of the Act is not a requisite for a fee award).

Here, while Colony has expressly agreed that Plaintiffs are entitled to recover reasonable attorney's fees without the need to prove each element of its claim under the Act, Plaintiffs would be entitled to an award under the Act even if Colony had not agreed to such an award.

### C. The Attorney's Fees and Expenses Incurred by Plaintiffs Are Reasonable

The Affidavits of Richard F. McMenamin and Marty R. Phillips, attached hereto as **Exhibits F and G** respectively, (the "Affidavits") explain and attest to the fees and expenses incurred in prosecuting the coverage claim in the face of the myriad of procedural and substantive defenses and arguments asserted by Colony both in this Court and in the Eastern District of Pennsylvania in an effort to avoid this Court from deciding this matter and in opposing Plaintiffs' coverage position on the merits. As set forth in the Affidavits, all such legal services and expenses were necessary to the prosecution of this action and are reasonable.

In <u>Adkinson v. Harpeth Ford-Mercury, Inc.</u>, 1991 WL 17177 at *10-11(Tenn. Ct. App. February 15, 1991) (**Exhibit H**), the Middle Section Court of Appeals determined that the eight factors set forth in DR2-106(B) govern the issue of whether attorney's fees and expenses sought under the Act are reasonable. The factors particularly applicable here are factors No. 1 (the time and labor required) and No. 4 (the amount involved and the results obtained).

Plaintiffs' counsel in Pennsylvania expended 520.7 hours of legal services in defeating the numerous procedural and substantive defenses asserted by Colony in its concerted effort to preclude this Court from resolving this matter and, once those procedural moves failed, attempting to avoid a determination of coverage by raising multiple substantive arguments that were rejected by the Court, including: (a) the alleged applicability of Pennsylvania law to the construction of an insurance policy issued to a Tennessee named insured with a Tennessee address in accordance with the Tennessee surplus lines law, and (b) the claim that Tennessee law was different than set forth in a controlling Tennessee Supreme Court decision. <u>See</u> Exhibit F. Plaintiffs' counsel in Tennessee expended 120 hours of legal services in connection with the same matters as described above. <u>See</u> Exhibit G.

Plaintiffs' counsel have also achieved significant results in that, as explained, the Dolby action presented a substantial risk to Chad, and they were able to obtain a favorable coverage result in this matter which resulted in Colony funding (pending any appeal of this Court's decision to the U.S. Court of Appeals for the Sixth Circuit) a significant percentage of the amount paid by Chad to settle the Dolby action.

Although the fees and expenses incurred were in no way contingent upon the outcome of this case, it should be noted that, Plaintiffs' total fees and expenses are less than seven percent of the value of the favorable decision in this action. Plaintiff's fees and expenses are therefore reasonable even as a percentage of the total recovered from Colony. In <u>Adkinson</u>, the Court of Appeals affirmed an award of $20,004 in attorney's fees where the actual damages recovered totaled only $8,555.36. Under all of the circumstances of this case, the attorney's fees and expenses sought by Plaintiff are reasonable.

## III.    CONCLUSION

For all of the foregoing reasons, this Honorable Court should award attorney's fees and expenses to Plaintiffs in the amount of **$290,123.78** pursuant to the express agreement whereby Colony has agreed to pay such fees and expenses, which agreement is in accordance with the standards set forth in Tenn. Code Ann. § 47-18-109(e)(1).

Respectfully submitted,

RAINEY, KIZER, REVIERE & BELL, PLC

_/s/ Ashley D. Cleek_____
MARTY R. PHILLIPS (BPR # 14990)
ASHLEY D. CLEEK (BPR #23562)
105 South Highland Avenue
Jackson, TN 38301
(731) 423-2414
mphillips@raineykizer.com
acleek@raineykizer.com


MORGAN, LEWIS & BOCKIUS, LLP

RICHARD F. MCMENAMIN
(admitted _pro hac vice_)
1701 Market Street
Philadelphia, PA 19103-2921
215.963.5000
rmcmenamin@morganlewis.com


Attorneys for Plaintiffs
Chad Youth Enhancement Center, Inc.
and Universal Health Services, Inc.

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been served upon counsel of record for Defendant Colony National Insurance Co. **via the Court's electronic filing system**:

Gil M. Coogler
White, Fleischner & Fino, LLP
61 Broadway, 18th Floor
New York, New York 10006
Ph: (212) 487-9700
Fax: (212) 487-9777
E-mail: gcoogler@wff-law.com

Michael B. Neal (BPR #8410)
McNabb, Bragorgos & Burgess, PLLC
81 Monroe Ave., 6th Floor
Memphis, Tennessee 38103
Ph: (901) 624-0640
Fax: (901) 624-0650
E-mail: mneal@mbb-law.com

Larry I. Gramovot
Gramovot & Takacs, P.L.
1400 Village Square Blvd., No. 3-405
Tallahassee, FL 32312-1231
Ph: (850) 325-1914
Fax: (850) 386-6321
E-mail: larry@lig-law.com

This, the 7th day of May, 2010.

_/s/ Ashley D. Cleek_____
Ashley D. Cleek

# EXHIBIT A

CHAMBERS OF
MITCHELL S. GOLDBERG
JUDGE

4000 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106
(267) 299-7500

February 4, 2010

Tom R. Kline, Esquire
Mark A. Hoffman, Esquire
David K. Inscho, Esquire
Counsel for Paulette Dolby

Kate S. McGrath, Esquire
Daniel J. Sherry, Esquire
Joseph J. Santarone, Jr., Esquire
Counsel for Chad Youth Enhancement
Center

Francis P. Devine, III, Esquire
Counsel for Universal Health Services, Inc.

Jeffrey M. Scott, Esquire
Counsel for City of Philadelphia

Douglas K. Jenkins, Esquire
Counsel for Probation Officer Javeta
Caldwell

Gil M. Coogler, Esquire
Coverage Counsel for Colony Insurance

Richard F. McMenamin, Esquire
Coverage Counsel for Chad/Universal
Health Services, Inc.

RE:   07-5288, Dolby v. UHS, et al. (E.D.Pa.)
      09-0545, Chad, et al. v. Colony (M.D.Tenn.)

Dear Counsel,

This is to confirm that the case captioned - Paulette M. Dolby v. Universal Health Services,

Inc., et al., No. 07-5288 ("Dolby"), between Plaintiff, Paulette Dolby, and Defendants, Chad Youth

Enhancement Center ("Chad"), Universal Health Services, Inc. ("UHS"), The City of Philadelphia,

and Probation Officer Javeta Caldwell, has been settled. The Rule 41.1(b) Order was filed today.

While the coverage dispute in the Middle District of Tennessee between Chad/UHS and Colony

National Insurance Company (Chad Enhancement Youth Enhancement Center, Inc., et al. v. Colony

1

National Insurance Co., No. 09-0545) has recently been resolved by the Tennessee District Court (Judge Robert L. Echols) specific binding agreements, not addressed in Judge Echols' opinion have previously been reached between Colony and their insured, Chad/UHS.

While I anticipate that the attorneys for all parties will reduce the terms of the settlement and accompanying agreements in the coverage case to writing, because I have been independently and extensively speaking with the respective attorneys on a variety of issues, I thought it prudent to outline the general terms of the settlement and coverage agreement.

1.    The total amount that will be paid to Plaintiff in the Dolby action is

# REDACTED

2.    UHS, the City of Philadelphia, and Probation Officer Caldwell will immediately be dismissed from the Dolby action.

3.    Within thirty days of the Tennessee District Court's ruling (2/2/10), Colony will pay the **REDACTED** additional              to Plaintiff in the Dolby action. Colony's decision to appeal that ruling will not impact their obligation to make payment to Plaintiff in the Dolby action.

4.    Should Colony choose to appeal the Tennessee District Court's ruling and they ultimately obtain a final appellate court decision (including any appeal to a higher appellate court) that holds that there is no coverage for punitive damages, Chad/UHS shall reimburse Colony as follows: 1) within 30 days from the conclusion of the appeal, Chad/UHS shall pay Colony **REDACTED**      and 2) within the same time frame, Chad/UHS shall pay Colony interest on              at the prime rate of interest as published in the Wall Street Journal ("Prime") plus 1%

2

as accrued from the date 18 months after a settlement agreement in the Dolby action to the conclusion of the appeal.

5.    Chad/UHS, as the prevailing party before the Tennessee District Court is entitled to recover reasonable attorneys' fees incurred in the prosecution of the Tennessee District Court action for Morgan, Lewis and Bockius LLP and Rainey, Kizer, Reviere & Bell, P.L.C., from Colony. Chad/UHS, may recover reasonable attorneys' fees without the necessity of proof required under the Tennessee Consumer Protection Act ("TCPA").

6.    Should Colony appeal the Tennessee District Court's decision and prevail on appeal with a final ruling that establishes that there is no coverage for punitive damages, Colony is entitled to pursue any rights they may have under the TCPA to recover reasonable attorneys' fees from their insureds, Chad/UHS, incurred in the defense of the Tennessee District Court action. The Tennessee District Court will determine what rights to pursue attorneys' fees, if any, under the TCPA are applicable, and the amount of reasonable attorneys' fees.

7.    Except for the rights preserved under paragraphs 5 and 6 of this agreement, the Insureds, Chad/UHS, and Colony waive all claims and any right to pursue any further claims arising from the matters alleged in the Dolby action.

8.    As a condition to Colony's obligation to pay **REDACTED** of the settlement amount, the Insureds, Chad/UHS, shall have obtained a full and complete release of all claims from Plaintiff in the Dolby action and any claims that the Plaintiff in the Dolby action has asserted, might have asserted, or might in the future assert against the Insureds, Chad/UHS, and/or any of their parents, affiliates, subsidiaries, representatives or agents, including, without limitation, all the insurers of those persons (including Colony) and the principals, employees,

3

agents, successors or assigns of such insurers.

9.      On the effective date of the release in the Dolby action, aside from coverage for punitive damages and reasonable attorneys' fees as set forth in paragraph 5, the Insureds', Chad/UHS, in the Tennessee District Court action will not seek coverage under the Colony policy for any other matters arising out of the Dolby action, and no claims, causes of action or lawsuits may be initiated or pursued by the Insureds, Chad/UHS, against Colony with regard to any claim arising out of the Dolby action.

**REDACTED**

10.     The Insureds, Chad/UHS, and Colony agree that the entire        payment to Plaintiff in the Dolby action constitutes punitive damages. However, this agreement is only between Chad/UHS and Colony and in no way binds Plaintiff in the Dolby action. In fact, Plaintiff in the Dolby action is free to advocate, in any forum they deem appropriate, their view regarding allocation of damages.

11.

12.

**REDACTED**

13.

14.

4

Very truly yours,

Mitchell S. Goldberg

5

# EXHIBIT B

Not Reported in S.W.2d, 1999 WL 817528 (Tenn.Ct.App.)

Judges and Attorneys
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.
J. Craig REED, and wife, Kristi L. Reed, Plaintiffs-Appellees,
v.
WALLY CONARD CONSTRUCTION, Inc., Gregory D. Shanks, d/b/a Shanks & Blackstock, and Jim
Nicely, d/b/a Jim Nicely Construction, Defendants,
and
West Knox Properties, Inc., Defendant-Appellant.

No. 03A01-9807-CH-00210.
Oct. 13, 1999.

Appeal as of Right from the Knox County Chancery Court, No. 03A01-9807-CH-00210; Frederick D.
McDonald, Chancellor.
W.F. Shumate, Jr., Shumate & Bowling, Knoxville, TN, for Appellant.

Henry T. Ogle, Knoxville, TN, for Appellee.

OPINION

SUSANO.

*1 This is an action under the Tennessee Consumer Protection Act ("the Act") that arose out of the sale of a residence. Following a bench trial, the court below awarded compensatory damages, attorney's fees, and discretionary costs to the plaintiffs, J. Craig Reed and wife, Kristi L. Reed ("the Reeds") to remedy a violation of the Act, *i.e.,* a misrepresentation by the seller of the property as to whether the location of the residence violates a subdivision setback restriction. The seller of the residence, West Knox Properties, Inc. ("West Knox"), appeals, raising three issues:

1. Did the Chancellor properly determine that West Knox had violated plaintiffs' rights under the Act?

2. Did the Chancellor correctly determine the amount of compensatory damages to which the Reeds were entitled in order to cure the violation of the setback requirement?

3. Are the plaintiffs entitled to an award of $5,300 in attorney's fees and an award of $2,803.10 in discretionary costs?

The Reeds argue in their brief that this case should be remanded "for consideration of an additional award of attorney's fees incident to the defense of this appeal."

I.

In December, 1994, the Reeds purchased a newly-constructed house in the Crest Haven Subdivision of Knox County from defendant West Knox. The purchase price was $138,350. At the closing, West Knox gave the Reeds a warranty deed, which deed provides, in pertinent part, as follows:

[West Knox] for itself and for its successors does hereby covenant with the [Reeds], their heirs and assigns that it is lawfully seized in fee simple of the premises above conveyed and has full power, authority and right to convey the same, *that said premises are free from all encumbrances except the county property taxes,* and that it will forever warrant and defend the said premises and the

title thereto against the lawful claims of all persons whomsoever.

(Emphasis added). The deed further provides that the conveyance is "made subject to all applicable restrictions, easements, and building set back lines of record...." By virtue of this edict, the conveyance was made subject to a provision of the subdivision restrictions stating that no building could be located within five feet of any side lot line.

At the closing, the title agent instructed the Reeds to sign a survey plat that reflected the layout of the house on the property. The survey plat shows that the house faces generally south; and that the side lot lines run generally from south to north as one faces the property. The front lot line is wider than the rear lot line. Thus, the width of the property narrows from the front to the back.

A notation in cursive on the plat indicates that a building setback of five feet is required along the side lot lines. Another such notation indicates that a five-foot utility and/or drainage easement exists inside the side lot lines. When the Reeds inspected the property, the lot lines were not staked. Thus, even though the northeast corner of the house is 1.9 feet from the eastern lot line, this fact was not readily apparent from an on-site inspection.[FN1]

*2 When the Reeds inspected the property, they believed that the house was properly located on the lot. Mr. Reed noted that the house seemed to blend with the rest of the subdivision in terms of the distance between their house and the neighboring houses. When the Reeds inspected the property, the lot lines were not staked. Thus, even though the northeast corner of the house is 1.9 feet from the eastern lot line, this fact was not readily apparent from an on-site inspection.[FN1]

> FN1. Approximately 14.3 square feet of the house lays in the setback area. Furthermore, in Mr. Reed's estimation at trial, the eave of the house is approximately six inches from the lot line.

The Reeds did not discover the encroachment until their neighbor advised them that he planned to erect a fence along the Reeds' eastern lot line. In planning the fence, the neighbor did a survey of the property and discovered that the Reeds' house intruded into the setback area. This was the first notice the Reeds had that the house violated a provision of the subdivision restrictions.

The Reeds brought suit against West Knox, alleging a violation of the Act and requesting treble damages.[FN2] Upon hearing the proof, the court awarded the Reeds a judgment in the amount of $3,600. Thereafter, the Reeds filed a motion to reopen the proof and to recover treble damages, attorney's fees, and discretionary costs. While denying the motion to reopen the proof and to award treble damages, the court granted an award of attorney's fees and discretionary costs.

> FN2. The Reeds also sued the developer and builder of the house, but these parties were dismissed by the trial court at the close of the plaintiffs' proof. The Reeds reached a settlement in the amount of $3,000 with another defendant, the attorney who had prepared the trust deed. West Knox is the sole remaining defendant in the case.

West Knox filed a motion to reduce the judgment by $3,000, the amount that the defendant title attorney paid to settle the claim against him. In its memorandum opinion, the trial court held that West Knox was entitled to the requested reduction. In reviewing the amount of the judgment, the court also reconsidered its initial award of damages:

This review has led to the conclusion that the amount of the damages awarded Plaintiffs at trial was erroneous. The award was based upon West Knox's contention that the error in the location of Plaintiffs' home on the lot could be remedied by taking a notch out of the corner of their house at a cost of $3,600.00. While notching out could correct the location problem, in ruling in favor of that solution virtually no consideration was given to Plaintiffs' view of how the location problem should be resolved. The notching out and damages resulting therefrom would be proper for a commercial

structure in which aesthetic considerations are of lesser, if any significant, import. However, in considering the amount and extent of damages to a home aesthetics are generally entitled to greater consideration. See: _Edenfield v. Woodlawn Manor, Inc., 62 Tenn.App. 280, 462 S.W.2d 237, 240-242 (Tenn.App.1970)_. Applying an essentially commercial standard to the allowance of damages in this case, rather than a residential standard, was error.

Plaintiffs sought to have the correction to their home be made by squaring off its entire end, and they objected to having a notch taken out of a corner of it. Plaintiffs' aesthetic sensibilities were accorded essentially no weight. Plaintiffs view that a squared off end on the house would be aesthetically more in keeping with the generally square type of home they contracted for and which they believed they had purchased, rather than a house with a notched out corner is understandable, and has merit. While Plaintiffs' desires do not totally control, their opinion of what would be the most acceptable solution to the problem, even though to a great extent based on aesthetic considerations, should be accorded substantial weight. Considering all of the circumstances in evidence Plaintiffs are entitled to have a squared off end on their house as they were willing to accept, and as they sought. While this is more expensive than the solution proposed by the defense, it is nonetheless far less expensive than would be moving the whole house, which would fully redress Plaintiffs' injury.

**\*3** Accordingly, the court awarded the Reeds a total of $26,500 in damages plus $5,300 in attorney's fees and $2,018.10 in discretionary costs.[FN3]

> FN3. The court determined that the cost of squaring off the end of the house to conform to the setback requirement would be $29,500. This sum was reduced by $3,000, the settlement paid by the defendant title attorney.

## II.

In this non-jury case, our review is _de novo_ upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; _Union Carbide Corp. V. Huddleston, 854 S.W.2d 87, 91 (Tenn.1993)_. The trial court's conclusions of law, however, are accorded no such presumption. _Campbell v. Florida Steel, 919 S.W.2d 26, 35 (Tenn.1996)_.

We also note that the trial court is in the best position to assess the credibility of the witnesses; therefore, such determinations are entitled to great weight on appeal. _Massengale v. Massengale, 915 S.W.2d 818, 819 (Tenn.App.1995)_; _Bowman v. Bowman, 836 S.W.2d 563, 566 (Tenn.App.1991)_. In fact, this court has noted that

> on an issue which hinges on witness credibility, [the trial court] will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary.

_Tennessee Valley Kaolin Corp. v. Perry, 526 S.W.2d 488, 490 (Tenn.App.1974)_.

## III.

After reviewing the record with the foregoing principles in mind, we cannot say that the evidence preponderates against the trial court's finding that West Knox violated the Act. The Act states, in pertinent part, as follows:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed ... as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

T.C.A. § 47-18-109(a)(1) (1995). "The Tennessee Consumer Protection Act is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." _Morris v. Mack's Used Cars, 824 S.W.2d 538, 540 (Tenn.1992)_. The Act is applicable to real estate

transactions between consumers and sellers engaged in the business of selling real property. *See Ganzevoort v. Russell, 949 S.W.2d 293, 297-98 (Tenn.1997)*.

We have recognized that "an unfair or deceptive act need not be willful or knowingly made to recover actual damages under the Consumer Protection Act." *Smith v. Scott Lewis Chevrolet, Inc., 843 S.W.2d 9, 12 (Tenn.App.1992)*(holding that negligent conduct constitutes a deceptive act or practice under the Act).

In its deed, West Knox represented that the property was "free from all encumbrances except the county property taxes." By making this statement, West Knox represented that the property had no encumbrances other than property taxes when in fact this was not the case. The northeast corner of the house lies within the five-foot setback area in violation of the subdivision restrictions. This violation of a restrictive covenant is an encumbrance on the title of the property. *See Staley v. Stephens, 404 N.E.2d 633, 636 (Ind.App.1980)*(finding setback violation created cloud on title because buyers exposed to possible litigation from other homeowners). Thus, West Knox's statement in the warranty deed that no encumbrances existed other than property taxes was a misrepresentation.

**\*4** Although the evidence does not suggest that West Knox knowingly made the subject misrepresentation, the evidence does preponderate that West Knox made this representation negligently. West Knox was acting in the course of its business of selling houses when it represented to the Reeds that the property was free from encumbrances except property taxes. Furthermore, the evidence preponderates that West Knox failed to exercise reasonable care in making this representation. According to Wally Conard, president of West Knox, the encroachment occurred when the bulldozer operator began excavating from the wrong surveying pin. Mr. Conard testified that he did not discover the encroachment until six months after the Reeds purchased the house. However, the eye of a trained professional such as Mr. Conard should have recognized from a cursory examination of the survey that the house encroached into the setback area. We find and hold that Mr. Conard was negligent in failing to discern the violation of the sideline setback requirement and in making a representation in the deed to the effect that no such violation existed.

When questioned at trial about the survey, Mr. Reed explained why neither he nor his wife noticed what is arguably an indication on the survey that the northeast corner of the house is one foot away from the eastern side line:

Q: Can you explain how you didn't see that? It's fairly clear on here it appears to me.

A: It is if you are looking for it.

Q: Well, did you take any time to examine the survey?

A: I did not try to rectify the survey with the other statements on the survey. I recognize it as my property. It says right here the building setbacks are five feet, [sic] must comply with building setbacks. Couldn't have conflicting information on a survey.

It is our judgment that the evidence supports a finding that West Knox made a negligent misrepresentation which violated the Act.

IV.

A.

Although the parties do not dispute the existence of a setback violation as the house now stands, the parties do dispute the effect of the violation on the property and how to remedy the problems created by it.

The evidence presented at trial preponderates that the setback violation adversely affects the marketability of the house. The plaintiffs' expert, attorney Stanley Roden, testified that the title is not marketable because of the violation. Dwight Sharp, vice-president of the bank that financed the Reeds' purchase, admitted on cross-examination that the violation "would have some bearing on"

selling the property.

Although the violation is not visually apparent in the property's current state, the violation would become very obvious if, as the Reeds' neighbor proposes, a fence is erected along the property line. With a fence along or near the property line, it would be obvious that the Reeds' house is too close to the line. Furthermore, Mr. Reed testified that one cannot move from the front of the property to the rear without trespassing on his neighbor's property. Thus, it is apparent from the evidence that the violation affects the aesthetic value and marketability of the Reeds' house.

**\*5** West Knox argues that any effect on the house's marketability could be resolved by amending the subdivision restrictions to require setback lines in compliance with the Knox County zoning requirements. Although the county's zoning ordinance also requires a minimum setback line of five feet, that ordinance-unlike the subdivision restrictions-does not prohibit a patio within the setback area. Thus, if, as West Knox proposes, the corner of the house is removed and a patio created from the exposed concrete slab, the Reeds' house would no longer be in violation of any setback requirement.

We do not find West Knox's proposed remedy to be a feasible one. Although a variance or an amendment to the subdivision restrictions might technically resolve the violation, such actions would not alleviate the aesthetic problems which ultimately affect the house's marketability. Furthermore, the Reeds would end up with a house which is irregularly shaped instead of the rectangular house they purchased. The "lopping off" of the offending corner may remedy the setback violation but it would leave a house that is unappealing to its owners and most likely undesirable to prospective purchasers.

We recognize that, in some cases, a violation of a setback restriction may be so minor as to warrant an award of only nominal damages. For example, in *Womack v. Ward,* 186 S.W.2d 619 (Tenn.App.1944), a restrictive covenant prohibited any building from being nearer than four feet to a common driveway shared by the plaintiff and the defendant. The defendant's house encroached eight inches into the setback area, and the plaintiff brought an action for violation of the restrictive covenant. We held that

[t]he record does not contain the slightest evidence that such encroachment has depressed either rental or sales value of this property. In short we have a technical breach of the quoted agreement but of such insignificant nature as to be unnoticed for a year the house was under construction.

*Id.* at 620. Because no actual damages were shown, we awarded only nominal damages to the plaintiff. *Id.*

However, cases such as *Womack* are distinguishable from the instant case. First, the evidence before us preponderates that the violation has an adverse effect on the marketability, or sales value, of the Reeds' house. Second, the setback violation in the instant case was more than a mere technical violation; the violation resulted in the Reeds purchasing a house that was different from that which was represented to them. The Reeds received a house which does not conform with the subdivision's restrictive covenants, thus possibly subjecting them to litigation in the future. *See Benton v. Bush,* 644 S.W.2d 690, 692 (Tenn.App.1982)("Restrictions to protect the beauty of the neighborhood, value of the property, and uniformity are covenants ... enforceable by the owner of any of the lots so protected by the restrictive covenants.") This is not a case for nominal damages. The Reeds have sustained real damages as a result of West Knox's violation of the Act.

**B.**

**\*6** We now turn to the issue of the measure of damages. Marvin House, an engineering consultant, testified as an expert witness for the Reeds. In his opinion, removing only the offending corner would disturb the aesthetic value of the house. Thus, he concluded, the most practical solution would be to sever the eastern end of the building, including the driveway, by approximately four feet. Mr. House testified that this approach would bring the house within the setback requirement and would avoid an irregularly-shaped structure. He estimated that the cost to do the needed modification would be in the range of $29,500 to $31,500.

West Knox presented the testimony of James Nicely, the builder of the Reeds' house. He proposed remedying the setback violation by removing 31 square feet of the laundry room and creating an uncovered patio from the exposed concrete slab. Mr. Nicely estimated that the cost of removing the corner of the house and leaving an uncovered patio would be $2,347.16.

We think that the proper measure of damages must take into account the effect that the setback violation has on the house's aesthetic value. *See Edenfield v. Woodlawn Manor, Inc.,* 62 Tenn.App. 280, 462 S.W.2d 237, 240 (Tenn.App.1970). In *Edenfield,* the purchaser of a condominium sued the developer because the installation of air conditioning ducts did not comply with the contract specifications. In awarding the plaintiff the full cost of replacing the air conditioning ducts, we referred to 13 Am.Jur.2d *Building and Construction Contracts* § 79 (1964):

The fundamental principle which underlies the decisions regarding the measure of damages for defects or omissions in the performance of a building or construction contract is that a party is entitled to have what he contracts for or its equivalent.

* * *

As a general rule, the measure of damages is the cost of correcting the defects or completing the omissions, rather than the difference in value between what ought to have been done in the performance of the contract and what has been done, where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results to be obtained. On the other hand, the courts generally adhere to the view that if a builder or contractor has not fully performed the terms of the construction agreement, but to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value between the work if it had been performed in accordance with the contract and that which was actually done, or (as it is sometimes said) the difference between the value of the defective structure and that of the structure if properly completed. Despite this latter rule, however, there is some authority to the effect that damages for a contractor's breach of a contract to construct a dwelling, where it is not constructed in accordance with the plans and specifications, *are* the amount required to reconstruct it to make it conform to such plans and specifications, rather than the difference in loan or market value on the finished dwelling, since unlike a commercial structure, a dwelling has an esthetic value and must be constructed as the owner wants it, even though the finished dwelling may be just as good.

*7 *Edenfield,* 462 S.W.2d at 241 (citing 13 Am.Jur.2d *Building and Construction Contracts* § 79 (1964)). We find the rationale of *Edenfield* to be persuasive here. We therefore affirm the trial court's award of damages based upon the cost of correcting the setback violation.

V.

A.

The Act provides that a court may award attorney's fees upon finding a violation of its terms. T.C.A. § 47-18-109(e)(1) (1995). We review the award of attorney's fees under an abuse of discretion standard. *See Haverlah v. Memphis Aviation, Inc.,* 674 S.W.2d 297, 306 (Tenn.App.1984). In the instant case, we find no abuse of discretion in the trial court's threshold decision to award attorney's fees.

West Knox challenges the amount of fees awarded in this case. Specifically, West Knox argues that documentation of an attorney's time spent on a case is a "traditional requirement" of recovering such fees.

"While it is preferable to prove the reasonableness of such fees through the affidavit of the attorney doing the work, the Court can determine a reasonable fee upon consideration of all facts and circumstances presented by the record." *Hennessee v. Wood Group Enters., Inc.,* 816 S.W.2d 35, 37 (Tenn.App.1991).

The Reeds filed a motion requesting an award of attorney's fees under the Act:

While the attorney has a belief that he has more than fifty (50) hours of his time devoted to the file

in the representation of Plaintiffs in the protection of their interest, he asked Plaintiffs to seek for him an award of $7,500.00 as an appropriate fee to be paid by Defendants to the Plaintiffs as their attorney fees.

The trial court awarded plaintiffs $5,000 in attorney's fees. We do not find this to be an unreasonable amount based upon the attorney's assertion that he spent more than fifty hours on the case. This issue is found adverse to the appellant.

B.

West Knox also challenges the chancellor's award of $2,018.10 in discretionary costs to the Reeds. Specifically, West Knox contests the award of $385.75 for the costs of court-ordered mediation.

"While reasonable and necessary costs in the preparation and trial of a lawsuit may be assessed as discretionary costs under T.R.C.P. 54.04(2), the awarding of such costs is a discretionary matter with the trial court." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 902 (Tenn.1992).

Rule 54.04(2), Tenn.R.Civ.P., defines the discretionary costs which are allowable as

reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions or trials, and guardian ad litem fees....

*Id.* We cannot say that the trial court abused its discretion in awarding discretionary costs for deposition expenses, court reporter expenses, and expert witness fees. While an award for the costs of mediation is not expressly authorized under Rule 54.04(2), we find that such an award is permitted under Section 7 of Rule 31 of the Rules of the Supreme Court:

**\*8** The costs of any alternative dispute resolution proceeding, including the costs of the services of the Rule 31 dispute resolution neutral, at the neutral's request, may be charged as court costs. The court may in its sound discretion waive or reduce costs of an alternative dispute resolution proceeding.

In the instant case, it appears that the "neutral" billed for his mediation services. This is the only reasonable explanation for the fact that the Reeds' attorney seeks reimbursement for such a charge. We find that billing by the neutral is tantamount to "the neutral's request" as set forth in Rule 31.

C.

Finally, the Reeds contend that this case should be remanded for consideration of an additional award of attorney's fees incident to the defense of this appeal. We do not find an award of fees on appeal to be appropriate in this case. Certainly, this appeal is not frivolous in nature. *See* T.C.A. § 27-1-122 (1980).

VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant. This case is remanded to the trial court for the enforcement of the judgment, and for collection of costs assessed below, all pursuant to applicable law.

GODDARD, P.J., and INMAN, Sr.J., concur.


Tenn.App.,1999.
Reed v. Wally Conard Const.
Not Reported in S.W.2d, 1999 WL 817528 (Tenn.Ct.App.)

---

Judges and Attorneys (Back to top)

Judges | Attorneys

Judges

- **Goddard, Hon. Houston**
State of Tennessee Court of Appeals, Eastern Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Profiler

- **Inman, Hon. William H**
State of Tennessee Court of Appeals, Eastern Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Profiler

- **McDonald, Hon F D**
State of Tennessee Chancery Court, 6th Judicial District
Tennessee
Profiler

- **Susano, Hon. Charles D. Jr.**
State of Tennessee Court of Appeals, Eastern Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

---

Attorneys

Attorneys for Appellant
- **Shumate, W. F. Jr.**
Current Firm Information Unknown
Litigation History Report | Profiler

Attorneys for Appellee
- **Ogle, Henry Tate**
Current Firm Information Unknown
Litigation History Report | Profiler

END OF DOCUMENT

(c) 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT C

Not Reported in S.W.2d, 1998 WL 867257 (Tenn.Ct.App.)

<u>Judges and Attorneys</u>
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.
Braxton D. DIXON, Plaintiff/Appellee,
v.
Steve BRYAN, Defendant/Appellant.

No. 01A01-9707-CV-00371.
Dec. 15, 1998.
Permission to Appeal Denied June 7, 1999.

Appeal from the Circuit Court of Sumner County, at Gallatin, Tennessee, the Honorable Thomas Goodall, Judge.
C. Tracey Parks Gallatin, TN, for Plaintiff/Appellee.
<u>William Kennerly Burger</u>, Murfreesboro, TN, for the Defendant/Appellant.

OPINION

LILLARD.

*1 This is an action brought under the Tennessee Consumer Protection Act. The suit arose out of a contract to sell an antebellum log home to be dismantled and moved. The trial court found that the defendant knowingly engaged in a deceptive trade practice, and awarded the plaintiff treble damages and attorney's fees. We affirm.

In June 1995, Defendant/Appellant Steve Bryan ("Bryan") placed an advertisement in a publication, the *Traders Post,* reading in pertinent part: "2 story Cedar Dog Trot Log House-To be moved-$5000 ..." The home, built in approximately 1820, was located in Bedford County. Plaintiff/Appellee Braxton Dixon ("Dixon") responded to the advertisement. Dixon is a builder and a designer who specializes in the restoration, preservation, and relocation of antebellum structures. Dixon and Bryan discussed the sale of the log home. Dixon alleges that Bryan told him that he owned the log home and "signed a statement to that effect."

The parties orally agreed that Dixon would purchase the home for $4000. Dixon tendered $2000 in cash to Bryan and agreed to pay the remainder after the house was dismantled. To document the transaction, Dixon signed a sales agreement entitled "Agreement and Bill of Sale," ("Agreement"). The Agreement listed Mrs. W.D. Haynes ("Haynes") as the "seller." Haynes had not signed the Agreement.

Dixon arranged to resell the log home to a purchaser in Texas and made preparations for the home's dismantling and shipment. At the site of the log home, before the dismantling was completed, Dixon was confronted by a local realtor. The realtor told Dixon that Haynes owned the home and that the realtor had listed the property for sale. Dixon immediately stopped his preparations for dismantling and transporting the log home.

Dixon later learned that Bryan had been trying for some time to purchase the home from Haynes. Bryan's draft purchase contracts, submitted to Haynes, had been rejected. After Bryan obtained the $2,000 deposit from Dixon, he had a $1,000 cashier's check drawn to Haynes and sought to meet with her to obtain permission to sell the log home and consummate the transaction. Bryan was unable to meet with Haynes.

In addition to the $2,000 paid to Bryan, Dixon incurred expenses originally estimated at $863.

Bryan agreed to return the $2,000 to Dixon and pay him $863 in expenses incurred. Bryan repaid the $2,000 deposit to Dixon but did not pay the expenses. Dixon later determined that his expenses totaled $1,038,66.

Dixon filed this action in Sumner County General Sessions court to recover his damages from Bryan's alleged breach of contract and misrepresentation. Dixon also sought treble damages and attorney's fees under the Tennessee Consumer Protection Act ("Consumer Protection Act") *See* Tennessee Code Annotated §§ 47-18-101 et seq. (1995 & Supp.1997). Default judgment was entered in General Sessions court, and the case was appealed to Circuit Court.

**\*2** Following a bench trial, the trial court found that Dixon suffered damages totaling $1,038.77. The trial court also found that Bryan "knowingly engaged in a deceptive trade practice." Consequently, the trial court awarded Dixon treble damages and attorney's fees under the Consumer Protection Act. The trial court, however, found that Dixon was negligent in not carefully reading the Agreement, and reduced Dixon's damages by ten percent. Thus, Bryan was awarded a total of $2,804.68, plus $775 in attorney's fees. From this order, Bryan appeals.

On appeal, Bryan contends that treble damages under the Consumer Protection Act were inappropriate. Bryan asserts that since the record contains no proof of any actual intent to deceive or mislead, and that the trial court erred by awarding treble damages.

Our review of the findings of fact by the trial court is *de novo* upon the record, accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn.R.Civ.P. 13 (d). Questions of law are *de novo* with no presumption of correctness. *Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn.1995).

The Consumer Protection Act, enacted in 1977, is "to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." *Morris v. Mack's Used Cars,* 824 S.W.2d 538, 540 (Tenn.1992) (citing *Haverlah v. Memphis Aviation, Inc.,* 674 S.W.2d 297, 305 (Tenn.App.1985). Persons harmed as a result of "an unfair or deceptive act or practice declared to be unlawful" by the Act may recover actual damages. Tenn.Code Ann. § 47-18-109(a)(1) (1995). The trial court may also award attorney's fees. *Id.* § 47-18-109(e)(1). If the trial court finds that the defendant "willful[ly] or knowing[ly]" violated the Act, the plaintiff may be awarded treble damages. *Id.* § 47-18-109(a)(3). Factors to be considered in determining whether to award treble damages include:

(A) The competence of the consumer or other person;

(B) The nature of the deception or coercion practiced upon the consumer or other person;

(C) The damage to the consumer or other person; and

(D) The good faith of the person found to have violated the provisions of this part.

*Id.* § 47-18-109(a)(4).

Bryan does not argue that the trial court erred in awarding Dixon actual damages under the Consumer Protection Act.[FN1] Bryan contends that the record does not indicate that he "willful[ly] and knowing[ly]" violated the Act, and that therefore the trial court erred in awarding treble damages. *Id.* § 47-18-109(a)(3). The linchpin of Bryan's argument is that Dixon signed the Agreement, which listed Haynes, rather than Bryan, as the seller. At trial, Dixon testified that he did not read the Agreement before signing it. However, Bryan notes that Dixon corrected the spelling of his name in the document. In addition, Bryan argues that Mary Ann McConnell ("McConnell"), a consultant of Dixon, testified at trial that she "questioned" the document. Bryan asserts that Dixon's signing of the Agreement imputes him with notice that Haynes, not Bryan, was the seller.

FN1. In *Ganzevoort v. Russell,* 949 S.W.2d 293, 297-98 (Tenn.1997), the Tennessee

Supreme Court held that the Consumer Protection Act does not apply to the purchase of real estate from a seller who is not "in the business of selling property as owners or brokers." This issue was not raised to the trial court and the record does not indicate whether Bryan was in the business of selling log homes or whether the log home would be considered realty. Consequently, we will not address the applicability of the Consumer Protection Act in this appeal. *Cf. Murvin v. Cofer,* No. 03A01-9702-CH-00055, 968 S.W.2d 304, 1997 WL 752648, at *5 (Tenn.App. Dec.8, 1997) (in a case that was tried before the *Ganzevoort* decision, the defendants, who did not raise the issue of the Act's inapplicability at trial, did not waive raising the issue on appeal, since the defendants' Answer "had the effect of denying each and every element of the plaintiffs' alleged cause of action").

**\*3** Bryan notes case law holding that, in the absence of fraud, a person who:

fails to read the contract or otherwise to learn its contents, ... signs the same at his peril and is estopped to deny his obligation, [and thus] will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence.

*Giles v. Allstate Ins. Co.,* 871 S.W.2d 154, 156 (Tenn.App.1993) (quoting *Beasley v. Metropolitan Life Ins. Co.,* 190 Tenn. 227, 232, 229 S.W.2d 146, 148 (1950)). Bryan also cites the axiom that "no man can recover upon the theory of fraud or mistake with respect to any matter of fact about which he has actual knowledge or legally imputed knowledge." *Hill v. John Banks Buick, Inc.,* 875 S.W.2d 667, 670 (Tenn.App.1993). Bryan reasons that since Dixon had legal notice of the fact that Haynes was the real owner, by virtue of the Agreement, Bryan could not have been deceptive and, thus, was not liable under the Act.

However, in the cases cited by Bryan, the issue was whether the contract should be enforced, as "where one who has negligently signed a contact without reading it, seeks to avoid his obligation...." *Giles,* 871 S.W.2d at 157; *see, e.g., Beasley, supra; Cravens v. Cravens,* 54 Tenn.App. 487, 392 S.W.2d 825 (1965); *Hermitage Health & Ins. Co. v. Buchignani,* 49 Tenn.App. 223, 354 S.W.2d 59 (1961). Here, there is no issue regarding whether the contract should be enforced. Rather, the issue is whether Bryan should be immunized from liability under the Consumer Protection Act, regardless of any deceptive or fraudulent actions that he may have perpetrated. In this case, there was evidence from which the trial court could conclude that Bryan affirmatively misrepresented that the owned he log home and that, consequently, he had the authority to sell it. The terms of the Consumer Protection Act are quite broad and are to be liberally construed to protect the consumer. *See* Tenn.Code Ann. § 47-18-104 (1995); *Morris,* 824 S.W.2d at 540. Under these circumstances, the fact that Haynes was listed in the Agreement as the owner of the log home does not immunize Bryan from liability for Dixon's damages.

No issue on appeal has been raised regarding the trial court's reduction of damages awarded to Dixon based on Dixon's negligence in failing to read the Agreement.

In this case, there is ample evidence from which the trial court could conclude that Bryan willfully and knowingly engaged in deceptive practices. The trial court was in the best position to consider the credibility of witnesses and, thus, its findings are entitled to "considerable deference." *Tenn-Tex Properties v. Brownell-Electro, Inc.,* 778 S.W.2d 423, 425-26 (Tenn.1989). The preponderance of the evidence supports the trial court's finding that Bryan "knowingly engaged in a deceptive trade practice." Consequently, the awarding of treble damages and attorney's fees [FN2] was appropriate in accordance with the Consumer Protection Act. Tenn.Code Ann. § 47-18-109(a)(3) & (e)(1) (1995).

FN2. Bryan's brief appears to suggest that attorney's fees are not appropriate unless the evidence demonstrates a "willful or knowing violation." Tennessee Code Annotated § 47-18-109(e)(1) does not require a showing that the defendant's actions were a "willful or knowing violation" in order for attorney's fees to be awarded. *Cf.* Tenn.Code Ann. § 47-18-109(a)(3) (1995). It simply requires a showing that a provision of the Consumer

Protection Act has been violated. *Id.* § 47-18-109(e)(1).

*4 The decision of the trial court is affirmed. Costs on appeal are taxed to the Appellant, for which execution may issue if necessary.

W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., concur.


Tenn.App.,1998.
Dixon v. Bryan
Not Reported in S.W.2d, 1998 WL 867257 (Tenn.Ct.App.)

---

Judges and Attorneys (Back to top)

Judges | Attorneys

Judges

- **Crawford, Hon. William Frank**
State of Tennessee Court of Appeals, Western Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Profiler

- **Highers, Hon. Alan E.**
State of Tennessee Court of Appeals, Western Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

---

Attorneys

Attorneys for Defendant
- **Burger, William Kennerly**
William Kennerly Burger
Murfreesboro, Tennessee
Litigation History Report | Profiler

END OF DOCUMENT

(c) 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT D

Not Reported in S.W.2d, 1993 WL 360443 (Tenn.Ct.App.)

<u>Judges and Attorneys</u>
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee Western Section, at Jackson.
Roger LEAKE, Plaintiff/Appellee,
v.
AIRPORT TOYOTA OF MEMPHIS, INC., Defendant/Appellant.

Sept. 14, 1993.

Appeal from the Circuit Court of Shelby County, Shelby Law, No. 02A01-9208-CV-0023; Wyeth Chandler, Judge.
<u>K. JAYARAMAN</u>, Memphis, for plaintiff/appellee.

Michael C. Williams, Evans & Petree, Memphis, for defendant/appellant.

<u>HIGHERS</u>, Judge.
    **\*1** Plaintiff filed a complaint against defendant in the Circuit Court at Shelby County alleging that defendant violated the Tennessee Consumer Protection Act in connection with the sale of a Toyota automobile. The court entered a jury verdict and a $26,015.41 judgment in favor of plaintiff. Defendant has appealed.

    On June 21, 1989, defendant, Airport Toyota of Memphis, Inc., sold a 1988 Toyota MR2 to plaintiff, Roger Leake, for $15,379.40. The automobile was a demonstrator model that had been used by one of the sons of a manager of defendant. Several days after taking delivery of the automobile, plaintiff phoned defendant stating that he had found broken glass in the automobile. Plaintiff asked defendant whether the automobile had been wrecked. Defendant told plaintiff that the automobile had not been wrecked, but that a window had been replaced because someone had broken into the automobile on defendant's premises. Defendant further informed plaintiff that a portion of the hood on the automobile had been repainted because of a small scratch. Thereafter, plaintiff attempted to return the automobile to defendant and demanded return of his down payment. Defendant refused to rescind the sale. Plaintiff ceased payments on the automobile and it was repossessed.

    On November 30, 1989, plaintiff filed a complaint against defendant alleging, as pertinent on appeal, that defendant violated the Tennessee Consumer Protection Act, <u>T.C.A. § 47-18-104(6)</u> et seq. by representing that the automobile was new while in fact it had been wrecked. Plaintiff asked the court to rescind the sales contract, to award actual and consequential damages, to award treble damages pursuant to <u>T.C.A. § 47-18-109(a)(3)</u>, and for attorney's fees pursuant to this same statutory section. Defendant answered denying the material allegations in plaintiff's complaint.

    The case was tried before a jury on June 17, 1992. Plaintiff testified that a salesman for defendant told him that the automobile was new when in fact the automobile had previously been titled in the name of B and F Leasing. Plaintiff testified that the automobile had a leaking roof, repainted hood and fender, bumpy wheel, replaced window, torn seat and a "funny-sounding motor." Plaintiff testified that he thought he was purchasing a "new demonstrator that had only been used by the company." Plaintiff testified that the defendant salesman failed to inform him that the automobile had previously been titled in the name of B and F Leasing, that the automobile had been broken into on defendant's premises and that the hood had been repainted.

    The general manager and sales manager of defendant, as well as the salesman involved in the sale of the automobile to plaintiff, testified on behalf of defendant. Their testimony was to the effect that

defendant salesman did not represent the automobile as new to the plaintiff and that the cost of painting the hood of the automobile and replacing the window was inexpensive relative to the price of the automobile.

**\*2** At the close of the proof the court instructed the jury that in order to find that plaintiff was entitled to rescind the sales contract and recover damages based on the misrepresentation or deception of defendant as alleged under T.C.A. § 47-18-104(6) *et seq.,* they must first find that there was a deception or misrepresentation. Secondly, the court instructed the jury that they must find that the fact or facts misrepresented or the deceptive practices related to the material issue involved in the sale of the automobile which substantially impaired its value and was a material inducement to plaintiff's purchase.

The jury returned a special verdict, finding that the defendant violated T.C.A. §§ 47-18-104(a), (b), (6), (7) and (26) which provides:

**47-18-104. Unfair or deceptive acts prohibited.**-(a) Unfair or deceptive acts or practices affecting the conduct of any trade or commerce are hereby declared unlawful.

(b) Without limiting the scope of subsection (a), the following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are hereby declared to be unlawful and in violation of this part:

\* \* \*

(6) Representing that goods are original or new if they are deteriorated, altered to the point of decreasing the value, reconditioned, reclaimed, used, or secondhand;

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

\* \* \*

(26) Engaging in any other act or practice which is deceptive to the consumer.

The court awarded plaintiff the sum of $7,800.00 in actual damages for defendant's violation of the Consumer Protection Act. Pursuant to T.C.A. § 47-18-109](a)(3) [FN1], the court doubled this award. The court further awarded a sum of $5,200.00 in actual damages for violations of the Consumer Protection Act together with prejudgment interest in the amount of $215.41. Pursuant to T.C.A. § 47-18-109(e)(1), the court awarded plaintiff's attorney's fees in the amount of $5,000.00. The court granted plaintiff a rescission of the sales contract. Defendant appeals.

> FN1. **47-18-109. Private right of action-Damages-Notice to division.**-(a)(3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.(4) In determining whether treble damages should be awarded, the trial court may consider, among other things:
>
> (A) The competence of the consumer;
>
> (B) The nature of the deception or coercion practiced upon the consumer;
>
> (C) The damage to the consumer; and
>
> (D) The good faith of the person found to have violated the provisions of this part.

On appeal, defendant argues that the evidence does not support the court's award of damages or a rescission of the sales contract. The substance of defendant's position in his brief and at oral argument, however, is that there is no evidence in the record from which the jury could have found that defendant's misrepresentations related to an issue that substantially impaired the value of the automobile. Defendant reviewed the testimony introduced at trial and asserted that the only objective evidence of impairment of value to the automobile was the cost of painting the hood which was $195.00 and the cost of replacing the window which was $65.00. Defendant concludes that the court erred in awarding damages and a rescission of the sales contract because the evidence does not support the jury's verdict.

Clarification of the issue on appeal is important because the defendant has failed to file a motion for new trial as required by the following portion of Rule 3(e), T.R.A.P.:

*3 An appeal as of right to the Supreme Court, Court of Appeals, or Court of Criminal Appeals shall be taken by timely filing a notice of appeal with the clerk of the trial court as provided in Rule 4 and by service of the notice of appeal as provided in Rule 5. An appeal as of right may be taken without moving in arrest of judgment, praying for an appeal, entry of an order permitting an appeal or compliance with any other similar procedure. Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived....

In _McCormic v. Smith,_ 659 S.W.2d 804 (Tenn.1983), the Supreme Court stated that:

[T]he motion for a new trial was retained as an important step of post-trial and appellate procedure in jury cases. This was done so that the trial judge might be given an opportunity to consider or to reconsider alleged errors committed during the course of the trial or other matters affecting the jury or the verdict, such as alleged misconduct of jurors, parties, or counsel which either occurred after the trial or could not reasonably have been discovered until after the verdict.

_Id._ at 806.

In _McCormic,_ tenant brought an action under the Uniform Residential Landlord and Tenant Act and the landlords counterclaimed. The jury awarded accrued rentals to the landlords but awarded a slightly larger judgment to tenants for damages. The jury also found that tenants were entitled to recover attorney's fees but did not set the amount. After receiving affidavits, the court set the amount of attorney's fees recoverable. Neither party filed a motion for a new trial. The landlords appealed, raising the sole issue of the correctness of the action of the trial judge in setting the attorney's fees post-trial and apparently _ex parte_ on affidavits. The Court of Appeals held that the appeal could not be considered because the landlords failed to file a motion for a new trial after entry of the judgment setting attorney's fees. The Court of Appeals cited the case of _Memphis St. Ry. Co. v. Johnson,_ 88 S.W.169 (Tenn.1905), for the proposition that whether an error alleged is that of the court or of the jury, it is necessary that a motion for a new trial be made.

The Supreme Court, in reversing the Court of Appeals, stated that while _Memphis St. Ry. Co._ was correctly decided upon the issues and facts presented to that court, it did not stand for the proposition that all errors of the trial judge, committed after trial and without participation by the jury, must be brought back for further consideration by the trial court on a motion under Rule 59 T.R.Civ.P. before such issues could be considered on appeal. The Supreme Court specifically stated:

*4 The language of Rule 3(e) of the Appellate Rules is consistent with Rule 50, T.R.C.P., and is limited to issues which were tried to the jury, to jury misconduct and to other events occurring during a jury trial or in some other way involving the jury, its verdict or instructions to that body. It was not intended to apply to actions of the trial judge such as those involved in the present case.

The majority of the Court of Appeals stated:

"Where an appellant is dissatisfied with the verdict of the jury, it is necessary to file a motion for a new trial."

This statement, insofar as it goes, is correct, but in the present case appellants were in no way dissatisfied with the jury verdict. The excess of the judgment awarded to the tenants over that awarded to the landlords was small, and appellants apparently have acquiesced therein. Their complaint is not with the jury verdict but with the action of the trial judge in undertaking herself to set a fee, with the amount thereof, and with the procedures involved in setting that amount.

*Id.* at 806.

Returning to the facts at bar, defendant has not contested the amount of damages awarded to plaintiff or any action taken by the trial judge. His primary complaint is that the jury verdict is not supported by material evidence. As such, defendant has waived its issues on appeal.

Plaintiff has asked this court for an award of attorney's fees and costs incurred by him on appeal. Plaintiff asserts that T.C.A. § 47-18-109(a)(3), *supra,* authorizes attorney's fees on appeal or, alternatively, that attorney's fees and costs should be awarded pursuant to T.C.A. § 27-1-122 as damages for a frivolous appeal. Defendant failed to file a motion for a new trial, and on appeal, he has argued that the court's award of damages was erroneous because the evidence does not support the jury's verdict. Essentially, defendant has asked the court to review and reweigh the evidence to determine if it supports a finding of a violation of the Consumer Protection Act. Under these circumstances, we think it appropriate to tax defendant with the costs on appeal and plaintiff's expenses, including attorney's fees reasonably incident to this appeal. T.C.A. § 27-1-122 (1980); *see McDonald v. Onoh, 772 S.W.2d 913 (Tenn.App.1989).*

Accordingly, we affirm the trial court's order and remand to the trial court for a determination of reasonable expenses and attorney's fees on appeal. Costs are taxed to defendant.

TOMLIN, P.J. (W.S.), and FARMER, J., concur.

Tenn.App.,1993.
**Leake v. Airport Toyota** of Memphis, Inc.
Not Reported in S.W.2d, 1993 WL 360443 (Tenn.Ct.App.)

---

Judges and Attorneys (Back to top)

Judges | Attorneys

Judges

- **Farmer, Hon. David R.**
State of Tennessee Court of Appeals, Western Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

- **Highers, Hon. Alan E.**
State of Tennessee Court of Appeals, Western Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

- **Tomlin, Hon. Hewitt P. Jr.**
State of Tennessee Court of Appeals, Western Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Profiler

Attorneys

Attorneys for Plaintiff
- **Jayaraman, K.**
Law offices of K. Jayaraman
Memphis, Tennessee
Litigation History Report | Profiler

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Not Reported in S.W.2d, 1992 WL 63443 (Tenn.Ct.App.)

Judges and Attorneys
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee, Eastern Section.
James RAMEY and wife, Tonya Ramey, Plaintiffs-Appellees,
v.
KINGSPORT MOTORS INCORPORATED, Defendant-Appellant.

No. 03A01-9110-CV 00370.
April 1, 1992.

Sullivan Law, Richard E. Ladd, Judge.
Steven G. Gott, Kingsport, for plaintiffs-appellees.

James H. Beeler, Kingsport, for defendant-appellant.

*OPINION*

FRANKS, Judge.

*1 In this action for damages to a motor vehicle, alleging violation of the Tennessee Consumer Protection Act, TCA Annotated § 47-18-101, et seq., and a negligent bailment, the jury returned a verdict for plaintiffs. The Trial Court entered judgment pursuant to the verdict. We affirm.

On February 22, 1989, plaintiffs entrusted their pick-up truck to defendant for a tune up. The truck was left overnight for replacement of brake cables and the tune-up.

Late the following afternoon plaintiffs took possession of the truck and observed the exterior of the vehicle had been washed. On their way home the truck began overheating. Upon checking the vehicle, plaintiffs noticed scratches on the paint and the interior engine component was caked with mud which covered the engine, battery and fire walls. They noted the odometer registered approximately 74 miles more than when the truck was delivered to defendant. There was no fluid in the radiator, and at a nearby service station approximately two gallons of water and antifreeze were added in the cooling system.

The following week plaintiffs returned the vehicle to the defendant, complaining about the scratches, overheating and dirty interior. Defendant agreed to clean the engine compartment and reimburse plaintiffs for the antifreeze. Defendant's representatives, according to plaintiffs, promised to investigate the use of the truck by defendant, and vowed defendant would "make good" on any damage to the truck.

Evidence developed at trial establishes that this representative of defendant was aware at the time plaintiffs returned the truck to the dealership that one of defendant's mechanics had driven the truck home and utilized it to haul hay across a muddy farm road.

Plaintiffs continued to have problems with the truck, including engine knocks and loss of power. Subsequently, the truck was taken to another dealer who made repairs and this action resulted.

At trial in a series of interrogatories, the jury found for plaintiffs on all issues, and awarded $1,723.00 in compensatory damages. The Trial Judge then determined plaintiffs were entitled to treble damages and attorneys' fees under the Tennessee Consumer Protection Act. He said both he and the jury had been "shocked" by the dealer's abuse of the vehicle, it's attempted concealment of what had happened, and the refusal to repair the damage. In addition to treble damages, a judgment

was entered for attorneys' fees and costs.

One of defendant's witnesses videotaped the alleged route plaintiffs' vehicle was driven by defendant's employee on his personal mission. The tape was made several months following the occurrence, and by defendant's admission conditions had changed, including upgrading of the route. Additionally the video contained frames of plaintiffs' truck in its condition at the time of trial. The Trial Judge refused to admit the video. The admission of videos like photographs, is determined in the exercise of the Trial Judge's sound discretion. _Given v. Lowe_, 661 S.W.2d, 687, (Tenn.App.1983). We find no abuse.

**\*2** Our review of a judgment based on a jury verdict is to determine whether there is material evidence to support the verdict, and we are required to take the strongest legitimate view of the evidence in favor of the verdict. _See Overton v. Davis_, 739 S.W.2d (Tenn.App.1987).

Once a bailor makes out a prima facie case of the bailee's negligence, i.e., returned in a damaged condition, the bailee is charged with the burden of producing evidence that the damage was not caused by bailee's negligence. _Irving Pulp and Paper v. Dunbar Transfer_, 732 F.2d 511 (6th Cir.1984) (applying Tennessee law); T.C.A. § 24-5-111.[FN1]

> FN1. Negligence of bailee. In all actions by a bailor against a bailee for loss or damage to personal property, proof by the bailor that the property was delivered to the bailee in good condition and that it was not returned or redelivered according to the contract, or that it was returned or redelivered in a damaged condition, shall constitute prima facie evidence that the bailee was negligent, provided the loss or damage was not due to the inherent nature of the property bailed.

Under the Tennessee Consumer Protection Act, unfair deceptive acts or practices affecting the conduct of any trade or commerce are unlawful. Tennessee Code Annotated § 47-18-104(a). The Act is liberally construed to protect consumers and others from those who engage in deceptive acts or practices, § 47-18-102(b). _Akers v. Bonifasi_, 629 F.Supp. 1212 (M.D.Tenn.1984). The Act confers a private right of action on an individual who suffers an ascertainable loss as a result of an unlawful practice. _Id._, citing § 47-18-109. Where a violation is established, actual damages are awarded and in the court's discretion, attorneys fees. § 47-18-109(a)(1) and (e). A knowing or willful violation of the Act is not a requisite for awarding actual damages and fees. _See e.g._, _Haverlah v. Memphis Aviation, Inc._, 674 S.W.2d 297, (Tenn.App.1984).

Plaintiffs' testified their truck was in "mint condition" when possession was surrendered to the defendant for a tune-up, and it was returned in the damaged condition. The burden then shifted to defendant to establish that the truck was not damaged by defendant's negligence. On the evidentiary record the jury could properly discredit defendant's evidence on this issue.

Defendant argues there was no expert proof of causation for plaintiffs' alleged damage. Similar arguments were made in _Crook v. Mid-South Transfer & Storage Co._, 499 S.W.2d 255 (Tenn.App.1973), where the bailors sued a warehouseman for damages to their personalty due to a fire. At trial there was conflicting evidence about how the fire originated, and the trial court left the causation issue to the trier of fact. On appeal, the bailee argued as appellant here, that the bailors failed to prove defendant's negligence was the proximate cause of loss. The _Crook_ court observed the bailee's insistence that the bailor must prove negligence was "not sound", 499 S.W.2d 259. The Court said:

> "In cases of this nature the burden is on the bailor to establish the precedent conditions required by T.C.A. § 24-515, that the property was delivered in good condition and returned in a damaged condition. Upon proof of those conditions, the burden shifts to the bailee to prove the damage was not caused by his negligence. _Id._"

There is material evidence to establish defendant failed to rebut the statutory presumption. Upon

the truck's return to plaintiffs, the truck was scratched, muddied, and devoid of essential radiator fluid. Upon delivery, the truck overheated and required water and antifreeze. The plaintiffs experienced engine problems with the truck from that time, and mechanics at trial acknowledged excess heat and dirt could cause damage to a truck's engine. While one witness suggested that the ring failure was unrelated to misuse during the test drive, he could not rule out that the dealership's negligence had caused the damage. Moreover, the jury was not required to accept defendant's evidence as to the extent of the use of the vehicle during the bailment.

**\*3** Significantly, all of the mechanics who testified had worked on plaintiffs' vehicle at some time and were testifying from personal experience and offering opinions. There were variances between the expert opinion testimony and conflicts in the testimony as to facts. Accordingly, a fact finder must determine the weight and credibility to be given to opinion testimony and all conflicting evidence. *See Act-O-Lane Gas Service Co. v. Clinton,* 245 S.W.2d 795, (Tenn.App.1951). *Also see Sparkman v. State,* 469 S.W.2d 692 (Tenn.Crim.App.1970).

There was material evidence that defendant's personnel collaborated to deceive plaintiffs about what had happened to their truck. The Trial Judge observed that he was "shocked" that the defendant had allowed a mechanic to take a customer's vehicle home for personal use, and observed:

"Apparently it didn't bother this dealer or the other dealer that has testified, that a mechanic could take a car home at night on a road test and use it for minor personal business. I think it would shock the average consumer that takes a car in to be worked on, that when they sign that release, if they ever read it, it would be that the mechanic drives it down the road, unless they get specific permission, and I think that shocked them. I think what shocked this jury is the stonewalling of the defendant here. If they had come in and said we've 'checked this out, all that happened was the mechanic was trying to do you a service and drove it home, picked up three bales of hay and drove it across his feed lot', but that was never revealed to the plaintiffs, they had to sue to find out. They only assumed the worse and I think it was also resolved by the jury on who they believed on whether they were promised this would be straightened out, and then the dealer went back on their word."

Under Tennessee Code Annotated § 47-18-109(a)(3), a court may award treble damages for violations of the Act if it finds violations were made willingly and knowingly. The Statute defines "knowingly" as actual awareness of a deception, but awareness may be inferred where objective manifestations indicate that a reasonable person would have known or had reason to know of the deception. § 47-18-103(6). For purposes of treble damages under the Act, "willful" means intentional. *Akers,* 629 F.Supp. at 1223. The Statute sets forth a list of factors for the Court to consider on the issue of treble damages at § 47-18-109(a)(3).

"(3) If the *court* finds that the use or employment of the unfair or deceptive act or practice was a *willful or knowing* violation of this part, court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.

(4) In determining whether treble damages should be awarded, the trial court may consider, among other things:

(A) The competence of the consumer or other person;

(B) The nature of the deception or coercion practiced upon the consumer or other person;

**\*4** (C) The damage to the consumer or other person; and

(D) The good faith of the person found to have violated the provisions of this part.

The Trial Court took into account the statutory elements in deciding treble damages were apt. The Statute expressly places this duty on the trial court, and the appellant's objections that allegedly erroneous jury instructions affected the treble damages award are misplaced. The Trial Judge took the jury's findings as to the defendant's conduct into account, but it was for the Court to determine the issue of treble damages. The evidence supports the award. *Compare Paty v. Herb Adcox*

*Chevrolet,* 756 S.W.2d 697 (Tenn.App.1988), where the dealer concealed that the vehicle advertised as new had been wrecked and repaired. *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585 (Tenn.App.1980), (record company led an aspiring singer to believe she had a standard contract in which the company took commercial risk, but had in fact signed custom record contract in which singer took the risk).

Finally, the award of attorneys' fees and costs was within the Trial Court's sound discretion on the record. Tennessee Code Annotated § 47-18-109(e)(1).

The judgment of the Trial Court is affirmed and the cause is remanded at appellant's cost.

GODDARD and MCMURRAY, JJ., concur.


Tenn.App.,1992.
**Ramey v. Kingsport Motors** Inc.
Not Reported in S.W.2d, 1992 WL 63443 (Tenn.Ct.App.)

---

Judges and Attorneys (Back to top)

Judges | Attorneys

Judges

- **Franks, Hon. Herschel P.**
State of Tennessee Court of Appeals, Eastern Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

- **Goddard, Hon. Houston**
State of Tennessee Court of Appeals, Eastern Grand Division
Tennessee
Litigation History Report | Judicial Reversal Report | Profiler

---

Attorneys

Attorneys for Defendant
- **Beeler, James H. Jr.**
Current Firm Information Unknown
Litigation History Report | Profiler

Attorneys for Plaintiff
- **Gott, Steven G.**
Current Firm Information Unknown
Litigation History Report | Profiler

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

CHAD YOUTH ENHANCEMENT
CENTER, INC.

      and

UNIVERSAL HEALTH SERVICES, INC.

      Plaintiffs.

      v.

COLONY NATIONAL INSURANCE CO.

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No. 3:09cv0545**
**District Judge Echols**
**Magistrate Judge Brown**

## AFFIDAVIT OF RICHARD F. MCMENAMIN

RICHARD F. MCMENAMIN, having been duly sworn, deposes and states as follows from his own personal knowledge:

1.    I am an attorney licensed to practice law in the Commonwealth of Pennsylvania. I am the long time outside counsel for Plaintiff Universal Health Services, Inc. ("UHS") in connection with matters of insurance coverage for UHS and its affiliates, and, as such, I am familiar with the insurance programs set up by UHS over the years.

2.    I have been counsel for UHS and its affiliate, Chad Youth Enhancement Center ("Chad" and together with UHS "Plaintiffs") in connection with their efforts to obtain insurance coverage from Defendant Colony National Insurance Company ("Colony") for the underlying matter that was pending in the Federal District Court for the Eastern District of Pennsylvania (the "Dolby action").

3. I am admitted to practice *pro hac vice* before this Court in this matter. I am also admitted to practice before the U.S. District Court for the Eastern District of Pennsylvania and the U.S. Court of Appeals for the Third Circuit.

4. I have been with the firm of Morgan, Lewis & Bockius, LLP ("Morgan Lewis") for over 36 years. For the past 24 years I have been a member of the firm. Before that I was an associate with Morgan Lewis for eight years and a law clerk for three years. My practice focuses almost exclusively on the representation of individual and corporate insureds in insurance coverage disputes with commercial insurance carriers.

5. Along with former associate Meredith Galto of Morgan Lewis, I have been responsible for the representation of Plaintiffs in their efforts to obtain insurance coverage from Colony for the potential liabilities of Plaintiffs in the Dolby action, including efforts to reach an interim settlement with Colony whereby the Dolby action could be resolved and the ultimate potential liability of Plaintiffs and Colony to the underlying plaintiff in the Dolby action would be capped.

6. I submit this affidavit in support of Plaintiff's Motion for the Award of Attorney's Fees and Expenses.

7. In order to represent the interest of Plaintiffs in connection with insurance coverage under the Colony policy it was necessary to engage in various activities over an extended period of time, including: (a) initial analysis of Colony's coverage denial and efforts to have Colony agree that there was coverage for punitive damages under the policy, which included gathering documentation regarding the brokering of the Colony policy and the binding and issuance of that policy; (b) when that effort failed, the preparation and filing of the pleadings in this action; (c) preparation of responses to Colony's motions seeking the transfer of this action

2

to the United States District Court for the Eastern District of Pennsylvania (the "Eastern District") and seeking the dismissal of Plaintiffs' claim under the Tennessee Consumer Protection Act; (d) in response to Colony filing a second filed action in the Eastern District, preparing Plaintiffs' motion to dismiss that action and supporting memoranda of law and preparing for and presenting oral argument on that motion; (e) preparing Plaintiffs' motion for partial summary judgment in this action on the issue of whether the Colony policy covered punitive damages and memoranda of law in support of that motion; (f) communications with the Court concerning Colony's failure to respond to Plaintiffs' motion for partial summary judgment and Colony's demand that it be entitled to take multiple depositions before it was required to brief the punitive damages coverage issue; (g) responding to Colony's motion for partial summary judgment on the punitive damages issue; (h) extensive negotiation with Colony regarding the settlement of the Dolby action and the payment of a portion of the settlement amount in that action; (i) discussions with, and correspondence to, the Court in the Dolby action in the Eastern District regarding settlement with Colony; (j) response to Colony communications to the Court regarding settlement of the Dolby action; (k) extensive communications with defense counsel and client representatives relating to efforts to obtain coverage from Colony; (l) participation in other court conferences, including conference call on February 23, 2010 regarding Colony's effort to obtain a reversal of the February 2, 2010 Order granting Plaintiffs' partial summary judgment; (m) preparation of motion for attorney's fees; and (n) numerous communications with client representatives and with Tennessee co-counsel regarding the foregoing activities.

      8.     The services to Plaintiffs have been charged at our customary rates and they have been the same as those charged in other cases in which I have represented Universal Health

3

Services, Inc. and other publicly traded corporations in significant coverage matters, and those rates are in line with the prevailing rates charged by other similarly experienced counsel in the Philadelphia, Pennsylvania community for providing similar services.

9.      My firm has spent approximately 525 hours working on this matter since its inception, and the nature of the work is as described in paragraph 7 of this Affidavit. All of my firm's work on this case has been in furtherance of Plaintiffs' efforts to obtain insurance coverage from Colony for the Dolby matter.

10.     My firm's fees total $257,376.80 and expenses total $8,443.47 from inception to date. Such fees were reasonable and necessary for the proper prosecution of this action, including the analysis of whether the matter could be settled with Colony without having to file this action.

FURTHER THIS AFFIANT SAYETH NOT.


RICHARD F. MCMENAMIN


COMMONWEALTH OF PENNSYLVANIA

COUNTY OF PHILADELPHIA

Sworn to and subscribed before me this 5th day of May, 2010

Notary Public

My Commission Expires:_____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Rosemary L. Lavin, Notary Public
City of Philadelphia, Philadelphia County
My Commission Expires Aug. 23, 2012
Member, Pennsylvania Association of Notaries

4

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| CHAD YOUTH ENHANCEMENT CENTER, INC. | ) ) ) | |
| and | ) ) | |
| UNIVERSAL HEALTH SERVICES, INC. | ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 3:09cv0545 District Judge Echols Magistrate Judge Brown |
| v. | ) ) | |
| COLONY NATIONAL INSURANCE CO. | ) ) | |
| Defendant. | ) | |

## AFFIDAVIT OF MARTY R. PHILLIPS

MARTY R. PHILLIPS, after having been duly sworn, deposes and testifies as follows:

1.     I have personal knowledge of the facts contained in this Affidavit, and I can testify to these facts in a court of law if called upon to do so.

2.     I am an attorney licensed to practice law in the State of Tennessee and in this Court, and I have served as counsel for Universal Health Services, Inc. and Chad Youth Enhancement Center ("Plaintiffs") in this litigation.

3.     I am a member of the law firm Rainey, Kizer, Reviere & Bell, PLC, and together with my associate, Ashley Cleek, have acted as local counsel and provided legal services to Plaintiffs in this case at my firm's standard and customary hourly rates that were in effect at the time.

4. The hourly rates charged by my firm to Plaintiffs in this case have been the same as those charged in other cases in which I have represented Plaintiffs and are in line with the prevailing rates charged by other counsel in the community for providing similar services.

5. My firm has spent approximately 120 hours working on this case from its inception, which includes preparing and filing the Complaint, filing and responding to motions, and engaging in all aspects of the litigation. All of my firm's work on this case has been in furtherance of Plaintiffs' efforts to obtain insurance coverage from Defendant Colony National Insurance Company ("Colony") in connection with an underlying matter that was pending in the Federal District Court for the Eastern District of Pennsylvania, as well as related damages based upon Colony's refusal to provide such coverage pursuant to the insurance agreement that was in place during the relevant time period.

6. My firm's fees total $22,572.00, and expenses total $1,731.51 from inception to date. Such fees and expenses incurred by Plaintiffs for my firm's work on the case were reasonable and necessary for the proper prosecution of this action.

FURTHER AFFIANT SAYETH NOT.

_____
MARTY R. PHILLIPS

STATE OF TENNESSEE
COUNTY OF MADISON

Sworn to and subscribed before me this _30th_ day of April, 2010.

_____
Notary Public

My Commission Expires: ___January 23, 2013___.

# EXHIBIT H

Not Reported in S.W.2d, 1991 WL 17177 (Tenn.Ct.App.)

<u>Judges and Attorneys</u>
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee, Middle Section, at Nashville.
Jean ADKINSON, Plaintiff-Appellee,
v.
HARPETH FORD-MERCURY, INC., Defendant-Appellant,

No. 01-A-01-9009-CH00332.
Feb. 15, 1991.

Williamson Equity, Appealed from the Chancery Court for Williamson County, Tennessee, <u>Cornelia A. Clark</u>, Judge.
<u>James W. White</u>, Waller, Lansden, Cortch & Davis, Nashville, for plaintiff-appellee.

<u>William Carter Conway</u>, <u>Kimberly K. Whaley</u>, Alexander, Conway & Williams, Franklin, for defendant-appellant.

*OPINION*

<u>LEWIS</u>, Judge.
   **\*1** This case was tried before a jury. The primary issue in the trial court was whether or not the defendant, Harpeth Ford-Mercury, Inc. (Harpeth), had violated the Tennessee Consumer Protection Act, <u>Tenn.Code Ann. § 47-18-101</u>, *et seq.* in its dealings with plaintiff, Jean Adkinson, when Adkinson purchased an automobile from Harpeth.

   The jury found that Harpeth was guilty of violating the Tennessee Consumer Protection Act and found that plaintiff was entitled to actual damages of $8,555.36. The plaintiff then moved for attorney's fees and an injunction under the Act. The trial court awarded attorney's fees of $20,004.00 and "permanently enjoin[ed Harpeth] from future violations of the Tennessee Consumer Protection Act, <u>Tenn.Code Ann. § 47-18-101</u>, *et seq.*"

   Harpeth has appealed from the judgment.

   The pertinent facts are as follows:

   Plaintiff had, in 1979 and 1981, purchased automobiles from Harpeth and, on both occasions, had dealt with Kenny Hughes, a salesman for Harpeth. In January 1984, plaintiff went to Harpeth and talked with Hughes about purchasing a new automobile for her personal use. She was very concerned with the cost of an automobile. After looking at several automobiles, she decided on a Ford LTD (Ford). Plaintiff asked Hughes how much the Ford would cost and, when told, stated that she did not feel she could afford the Ford.

   Hughes left the office, returned a few minutes later, and asked plaintiff if she had ever considered leasing an automobile. Plaintiff told Hughes she had not. Hughes then told plaintiff her payments would be less leasing an automobile than if she purchased it. She then decided to lease the Ford for, among other reasons, the smaller monthly payment.

   The parties entered into a "closed-end" lease. Under a "closed-end" lease, the lessee does not have an option to purchase the leased automobile, and the lessee does not have an obligation to pay for the "residual" or "leased-end" value at the end of the lease term. The lease was for a term of forty-eight months with payments of $251.63 per month. Plaintiff was required to post a security

deposit of $275.00 which was to be returned at the end of the lease term. She was also to pay six cents ($.06) per mile for mileage in excess of 60,000 and to pay for "excess wear and tear."

Plaintiff relied on Hughes to explain the lease to her and did not read the lease "in detail." Plaintiff relied on Hughes because she had dealt with him in two previous transactions.

Plaintiff traded in her 1981 automobile when she entered into the lease for the Ford. At the time of the trade-in, plaintiff had equity of $384.69 in the 1981 automobile.

There is evidence that instead of giving plaintiff credit for the 1981 automobile, Harpeth added the $384.69 equity to the cost of the lease. The handwritten "Retail Buyer's Order," signed by plaintiff, did not reflect a credit for the $384.69. The typed version, prepared a day later and which was not signed by plaintiff, shows that plaintiff's equity was added to the cost of the lease. The typed version was used by Harpeth for internal purposes. The net effect of failing to give plaintiff credit for the equity, in fact, increased the cost of the lease by $769.38 which, in turn, increased the lease payments. Eight of the payments (May through December) were ultimately included in the price plaintiff paid to purchase the Ford.

**\*2** On 29 April 1987, plaintiff called Hughes and asked him if she would be required to do anything to the leased Ford in terms of maintenance or replacement of tires when the lease expired in January 1988. Plaintiff testified that Hughes did not give her a direct answer but asked her to come to Harpeth and talk about it.

Plaintiff testified that she went to Harpeth on that same date and met with Hughes. She again asked him what her obligations would be at the end of the lease as to tires and maintenance. Plaintiff was told by Hughes that she would owe a $7,000.00 pay-off at the end of the lease.

Plaintiff testified that she tried to explore ways to avoid the pay-off. She asked Hughes about turning in the Ford and leasing a Ford Escort. Hughes told her that she would still be responsible for the pay-off on the Ford and that when the pay-off was added to a Ford Escort lease, the monthly payment would be more than $400.00. Plaintiff felt she could not pay a $400.00 monthly payment. Plaintiff testified that Hughes then told her that she could get out of the lease with what he referred to as a "flip-over," a transaction in which she would purchase the Ford.

Under the "flip-over," the monthly payments to purchase the Ford would be only ten cents ($.10) more per month than her lease payment. However, the payment would be extended for forty-two additional months.

Plaintiff testified that she was confused about the pay-off, that she told Hughes she would be out of town for two weeks and would talk with him when she returned. Hughes told her there was no need to wait, that the paperwork on the "flip-over" could be prepared in a few minutes.

Plaintiff concluded, based upon what Hughes told her, that there was no way she could turn in the leased Ford at the end of the lease term without paying the $7,000.00. She further testified that she could not afford to pay the $7,000.00 and also buy or lease another automobile.

Plaintiff then purchased the Ford on the same day she had called Hughes to determine what would be required of her when she returned the automobile at the end of the lease term.

She testified that she did not want to buy the car and was "heart-sick" that she would have to make an additional forty-two payments on an automobile that had 53,000 miles on it.

Hughes testified that plaintiff indicated that she was very happy with the Ford and wished to purchase it, and that he simply supplied her with the pay-off amount.

After agreeing to purchase the Ford, she was taken to the finance office but was asked to wait in the showroom while her papers were being prepared.

There had been no discussion between plaintiff and anyone at Harpeth to this point about an extended warranty or credit disability insurance. Plaintiff testified that she was completely unaware of the concept of an extended warranty or credit disability insurance.

The person who prepared the finance papers told plaintiff she needed the extended warranty because the Ford was getting older. Hughes, after plaintiff was shown the credit disability insurance form, told plaintiff that almost everyone bought it "because of what it does for you." Plaintiff then signed all the papers that were shown to her.

**\*3** Plaintiff's purchase of the Ford was financed through the Ford Motor Credit Company (FMCC). Plaintiff was told that the interest rate was 16.5% per annum for a total interest charge of $2,613.41. Harpeth did not inform plaintiff that 2.5% of the 16.5%, or $459.37, would be returned to Harpeth by FMCC if plaintiff made all of the payments. FMCC charged an interest rate of 14 percent and Harpeth added for itself an additional 2.5%. Harpeth did not disclose to plaintiff that Harpeth, and not FMCC, had imposed the additional charge.

Plaintiff's security deposit of $275.00, which she paid at the front end of the lease, was to be refundable. Plaintiff was not refunded the $275.00 directly, and nothing in the sales documents indicate that the security deposit was credited to plaintiff when she purchased the Ford.

The security deposit could be retained by Harpeth only if the plaintiff failed to make lease payments or if there was damage to the Ford at the end of the lease. The record is clear that neither of these circumstances occurred.

Harpeth insisted at trial that as a matter of policy the security deposit would have been "netted out" of the pay-off for the Ford. However, Harpeth's statements through its General Manager Joe Mobley to plaintiff and her fiance Larry Sheehan, approximately one month after the Ford was purchased by plaintiff, was quite different. Joe Mobley told plaintiff and Sheehan that plaintiff could not get the security deposit back because she had not completed the lease. He told them this, in spite of the fact that the price the plaintiff paid for the Ford included the remaining lease payments.

Plaintiff was unaware of exactly what had occurred between her and Harpeth until a day or two after the transaction was completed. At this time she talked with her fiance Larry Sheehan by telephone. Larry Sheehan, who was an airline pilot and was in Nashville on a limited basis, told plaintiff he did not think that she had to buy the Ford but that he would look at the papers when he was in Nashville approximately one month later.

When Larry Sheehan came to Nashville, he and plaintiff met with Joe Mobley at Harpeth. At that time Mobley repeated what Hughes had stated regarding plaintiff being responsible for the $7,000.00 pay-off. After reviewing plaintiff's lease, Mobley left and returned with a blank lease. Mobley then attempted to support his claim that plaintiff was responsible for the pay-off by showing plaintiff and Sheehan a blank "open-end" lease with option to purchase. This was contrary to plaintiff's "closed-end" lease with no option to purchase.

Larry Sheehan pointed out to Joe Mobley this difference in the structure of the leases. Joe Mobley then said Harpeth did not use closed-in leases any more. When Mobley was asked why Harpeth no longer used the closed-end lease, he replied that Harpeth wanted its lease customers to buy the cars they leased because if Harpeth had to put the cars on the used car lot, Harpeth would lose some $1,500.00 to $2,000.00 on each car.

**\*4** Plaintiff and Sheehan had been unable to make the numbers add up on the purchase of the Ford. When they met with Joe Mobley, he could not make the numbers add up. He then asked a lady from the accounting department to come into the office to add up the numbers. She could not make them add up.

At this meeting Mobley acknowledged that there had been a "misunderstanding." However, he refused to rescind the transaction, and he never contacted FMCC or made any other effort to resolve the problem.

Sometime later plaintiff filed this suit.

Following an evidentiary hearing, the jury was given a special jury verdict form in which they were asked to answer eight questions. They are as follows:



*JURY VERDICT FORM*

1. Was Harpeth Ford-Mercury, Inc. guilty of intentional misrepresentation in connection with the April 29, 1987, sale of the Ford LTD to Jean Adkinson?

_____Yes          X          No

If your answer to No. 1 was "Yes", then do not answer No. 2 and go on to No. 3. If your answer to No. 1 was "No", then go on to No. 2.

2. Was Harpeth Ford-Mercury, Inc. guilty of negligent misrepresentation in connection with the April 29, 1987, sale of the Ford LTD to Jean Adkinson?

\_\_\_\_\_X\_\_\_\_\_Yes          _____No

3. Did Harpeth Ford-Mercury, Inc. use unfair or deceptive acts or practices in connection with the April 29, 1987, sale of the Ford LTD to Jean Adkinson?

\_\_\_\_\_X\_\_\_\_\_Yes          _____No

If the answer to No. 3 was "yes", answer no. 4 before going on. If the answer to No. 3 was "No", do not answer No. 4 but go on to No. 5.

4. Was Harpeth Ford-Mercury, Inc.'s conduct willful or knowing?

_____Yes          X          No

If the answer to No. 4 was "Yes", be sure to Answer No. 7. If the answer to No. 4 was "No", do not answer No. 7.

5. If the answer to No. 3 was "yes", should the contract between Harpeth Ford-Mercury, Inc. and Jean Adkinson be rescinded?

          X          Yes                              No

6. If the answer to any of Questions 1, 2, 3, 4, or 5 was "Yes", enter the amount of actual damages to Jean Adkinson sustained by the acts in question.

          $8,555.36

7. If the answer to Question 4 was "Yes", do you choose to award three times the actual damages as provided by the Consumer Protection Act?

          Yes                              No

8. If the answer to Question 3 or 4 was "Yes", do you choose to award plaintiff her reasonable attorney fees?

     X          Yes                              No

18 January 19     /s/   John Morris
     Date                  Foreman

Judgment was entered on the jury's verdict, and the trial court, pursuant to Tenn.Code Ann. § 47-18-109(a)(1), awarded plaintiff's attorney's fees in the amount of $20,004.00 and expenses of $2,885.91 and imposed an injunction pursuant to Tenn.Code Ann. § 47-18-109(b).

Harpeth has presented several issues. We first discuss whether there is material evidence to support the verdict.

**\*5** This is a jury trial, and in a jury trial, if there is any material evidence to support the verdict, the judgment must be affirmed. Tenn.R.App.P. 13(d); *Cary v. Arrowsmith, 777 S.W.2d 8, 23 (Tenn.App.1989).* In a case where plaintiff prevails in a jury trial, appellate courts must take as true that which has a tendency to support the plaintiff's right of recovery, discard all countervailing evidence, and allow all reasonable inferences to be drawn from the evidence in favor of the plaintiff. *Mason v. Tennessee Farmers Mut. Ins. Co., 640 S.W.2d 561, 564 (Tenn.App.1982).* Substantial and material evidence is that which a reasonable mind might accept as adequate to support a rational construction and furnish a reasonably sound basis for the action under consideration. *South Cent. Bell Tele. Co. v. Tennessee Pub. Serv. Comm., 579 S.W.2d 429, 440 (Tenn.App.1979).* Appellate courts do not reweigh evidence. If there is some material substantial evidence which supports the jury verdict, the verdict must be affirmed.

While in this case the plaintiff's evidence is, in a lot of particulars, diametrically opposed to the evidence of the defendant, this raises a question of credibility. The credibility of witnesses and the weight to be given their testimony is for the jury. *State v. Chumbley,* 27 Tenn.App. 377, 385, 181 S.W.2d 382, 385 (1944). In this case the jury has resolved the question of credibility in the plaintiff's favor.

Taking all of the rules into consideration, there is substantial material evidence to support the verdict of the jury.

The evidence shows that plaintiff was an unsophisticated, trusting customer. She was employed by the Baptist Sunday School Board in Nashville. She was not a world-wise career woman who had worked in the business community for several years as insisted by Harpeth. Plaintiff's job was to help churches set up libraries. She had no business training or business education and, according to her testimony, "almost zero" familiarity with business matters.

The record shows that Harpeth cultivated plaintiff's trust over a period of years. She first met Joe Mobley, Harpeth's general manager, in 1981. He told the plaintiff at that time that he was a leader in his church, a Southern Baptist congregation. Each time that plaintiff saw Joe Mobley, including the 29 April 1987 date that she purchased the Ford, he discussed church matters with her.

The record shows that in January 1984, when Adkinson traded her 1981 automobile in on the lease of the Ford, Harpeth added her equity in the 1981 automobile to the cost of the lease rather than giving her credit for it. Harpeth then appropriated the equity in the 1981 automobile for itself. The document which plaintiff signed did not show this added charge. It was only the typed document which was characterized by Harpeth at trial as an internal document which showed the added charge. This was never shown to plaintiff.

This practice increased the cost of the lease to plaintiff by increasing the lease payments and, ultimately, increased the cost of the Ford when plaintiff purchased it because the remaining lease payments were incorporated into the purchase price. Plaintiff trusted Harpeth and erroneously believed she had been given credit for her equity in the 1981 automobile.

**\*6** Harpeth does not deny that there is evidence in the record to support a finding that plaintiff was told by Hughes and Mobley that she would owe a $7,000.00 payment on the Ford at the end of the lease. However, Harpeth spends several pages in its brief arguing in effect that the testimony of Hughes and Mobley is more credible than plaintiff's testimony under the circumstances. Credibility of the witnesses and the weight to be given their testimony is, as we have stated, for the jury to pass upon. *State v. Chumbley,* 27 Tenn.App. at 385, 181 S.W.2d at 385. Harpeth also fails to acknowledge that there is corroborating evidence of Sheehan that Mobley told both plaintiff and Sheehan that plaintiff would be responsible for the $7,000.00 pay-off on the Ford at the end of the lease and that Mobley even attempted to justify this position by showing plaintiff and Sheehan a blank "open-end" lease.

Harpeth insists in the face of this that plaintiff's being taken advantage of was her own fault, that she should have known of these misrepresentations because of the documents relating to the transaction. As is pointed out by plaintiff, this argument reflects a "blame the victim" view point.

Tennessee Code Annotated § 47-18-102 sets forth the purposes of the Tennessee Consumer Protection Act and provides:

The provisions of this part shall be liberally construed to promote the following policies:

(1) To simplify, clarify, and modernize the state law governing the protection of the consuming public and to conform these laws with existing consumer protection policies;

(2) To protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state;

(3) To encourage and promote the development of fair consumer practices;

(4) To declare and to provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state; and

(5) To promote statewide consumer education.

There is evidence in this record that there were oral misrepresentations made by Harpeth that induced a written contract. Oral misrepresentations that induce a written contract may form the basis for a cause of action under the Tennessee Consumer Protection Act, notwithstanding language of the subsequent written contract. _Brungard v. Caprice Records, Inc.,_ 608 S.W.2d 585, 588 (Tenn.App.1980).

Tennessee Code Annotated § 47-18-104(a) provides: "Unfair or deceptive acts or practices affecting the conduct of any trade or commerce are hereby declared unlawful." Tennessee Code Annotated § 47-18-104(b)(12) provides that "[r]epresenting that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law" is a deceptive act or practice.

**\*7** The jury determined that the oral misrepresentation by Harpeth employees concerning the $7,000.00 pay-off was an unfair or deceptive act and a violation of the Tennessee Consumer Protection Act.

We have considered each of the cases cited by Harpeth and find them to be inapposite to the facts of this case.

There is material evidence to support the jury's finding that Harpeth engaged in unfair or deceptive acts or practices regarding the $7,000.00 pay-off.

There is evidence in the record which supports the jury's finding that Harpeth used high-pressure tactics in pressuring plaintiff to buy the Ford on the same day she called Hughes to determine her obligations on expiration of the Ford lease. When plaintiff told Hughes that she would return in a couple of weeks, he told her there was no need to wait, that the paper work could be prepared in a few minutes. Additionally, Hughes led plaintiff to believe that there was no way to avoid the $7,000.00 pay-off except by the "flip-over." It was Harpeth's intention through Hughes to sell plaintiff the Ford that day before she could leave and think about it or talk to anyone else.

We are also of the opinion that under the circumstances it was proper for the jury to base a finding of unfair or deceptive acts and practices on the evidence at trial which shows that Harpeth kept for itself 2.5% of the 16.5% annual percentage rate financing which plaintiff was led to believe was charged by FMCC to finance the transaction. Harpeth told plaintiff that FMCC was financing the transaction but failed to disclose to plaintiff that it had secretly imposed the 2.5% additional charge. Plaintiff was led to believe, both by the contract documents and Harpeth's oral representations, that FMCC required the 16.50 annual percentage rate.

The record also supports the finding that Harpeth failed to refund the security deposit, that approximately a month after the time plaintiff purchased the Ford she inquired about the security deposit, and that Joe Mobley told Sheehan and plaintiff that plaintiff could not get the security deposit back because plaintiff had not completed the lease. Mobley denies this, but the credibility of the witnesses is for the jury to determine.

There is substantial material evidence that Harpeth engaged in unfair or deceptive acts or practices under the Tennessee Consumer Protection Act and that it also made negligent misrepresentations to plaintiff.

Harpeth raises the issue of "[w]hether the court erred in failing to direct a verdict for Harpeth

based on the undisputed proof at trial and the jury's findings that there were no intentional misrepresentations."

When a motion for a directed verdict is made, the trial judge, and this Court on appeal, must look to all of the evidence, take the strongest legitimate view of it in favor of the opponent of the motion and allow all reasonable inferences from it in the opponent's favor. The court must discard all countervailing evidence and, if then there is any dispute as to any material determinative evidence or any doubt as to the conclusion to be drawn from the whole evidence, the motion for a directed verdict must be denied. *Country Maid Dairy, Inc. v. Hunter,* 57 Tenn.App. 138, 149, 416 S.W.2d 367, 372 (1967). There is material determinative evidence that Harpeth engaged in unfair or deceptive acts or practices affecting the conduct of trade or commerce and pursuant to Tenn.Code Ann. § 47-18-104. Those unfair or deceptive acts are unlawful.

**\*8** This issue is without merit.

Harpeth also argues:

The jury verdict is excessive and there should be a remittitur and credit given Harpeth for the fair market use or rental value of the LTD by Atkinson from April 29, 1987 until the present. Also, Harpeth is entitled to a credit given on any payment claimed as damages by Adkinson for the extended warranty, credit life and disability in that the undisputed proof shows that the same could be cancelled at any time by Adkinson.

This issue was neither pleaded or tried in the trial court. No proof was offered by Harpeth regarding any credit it should be given. There is not a scintilla of evidence in the record regarding the fair market use or rental value of the Ford.

Issues which were not tried in the trial court cannot be raised for the first time on appeal. *Lake Countyv. Truett,* 758 S.W.2d 529, 537 (Tenn.App.1988).

Harpeth defended in the trial court on the theory that it had made no misrepresentations of any kind and that it had engaged in no unfair or deceptive acts or practices. It did not plead set-off as a defense and did not introduce any evidence of any fair rental value.

The trial court will not be put in error for not awarding set-off when there was no proof in the record which would entitle Harpeth to set-off. See *Mechanic Savings Bank & Trust Co. v. Scoggin,* 52 S.W. 718 (Tenn.Ch.App.1899).

This issue is without merit.

Harpeth's next issue is "[w]hether the trial court erred in giving the special jury verdict form to the jury over Harpeth's objection."

Harpeth says that it "strenuously asserts that submission of the special jury verdict form to the jury by the Trial Court over Harpeth's objection was irreversible [ *sic* ] error." Harpeth simply argues that the jury verdict form was improper. It cites no authority in support of this contention. Our reading of the jury verdict form fails to disclose that it was improper.

The verdict form was prepared by the court and properly identified the matters for the jury's consideration. We find nothing in the record to show that it was improper.

This issue is without merit.

Harpeth next contends that "the trial court erred in awarding Adkinson's attorney sums in excess of that which he would have otherwise received pursuant to the contingency fee contract...."

Plaintiff entered into a contingency fee contract with her attorneys which provided that the attorneys would receive "one-third of any recovery." Additionally, the plaintiff was responsible for all

expenses of the suit. Contingency fee arrangements between an attorney and the client are valid in Tennessee.

Tennessee Code Annotated § 47-18-109(e)(1) provides: "Upon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs."

We have found no case, nor have we been cited to a case, that has discussed what is a reasonable attorney's fee under the Tennessee Consumer Protection Act.

**\*9** Rules of the Supreme Court, Rule 8 DR2-106(B) sets forth "[f]actors to be considered as guides in determining the reasonableness of a fee, includ [ing] the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

We have reviewed several federal civil rights cases [FN1] and are of the opinion that the reasoning in those cases is applicable to the awarding of attorney's fees under the Tennessee Consumer Protection Act.

In _Conklin v. Lovely,_ 834 F.2d 543 (6th Cir.1987), a case involving 42 U.S.C. § 1988 regarding attorneys fees, the court held that the existence of a contingent fee arrangement is a factor that in certain circumstances may justify an attorney's fee award at a level above the attorney's hourly rate. _Id._ at 553. The court in _Conklin_ also held that the risk inherent in litigating under a contingency fee may render the attorney's hourly rate of compensation inadequate. _Id._

Attorney's fee awards under the civil rights statutes are not tied to the amount awarded by the jury in damages. _See City of Riverside v. Rivera,_ 477 U.S. 561, 581, 106 S.Ct. 2686, 2697 (1986). In _City of Riverside,_ the Court upheld an award of attorney's fees in excess of $245,000.00 where the jury awarded damages of only $33,350.00. The rationale for this rule is that plaintiffs in civil rights cases bring suit as private attorneys general acting for the public benefit as well as for themselves. _McCullough v. Cady,_ 640 F.Supp. 1012, 1021 (E.D.Mich.1986).

While the instant case does not involve a civil rights action, it does involve the Tennessee Consumer Protection Act, Tenn.Code Ann. § 48-18-101 _et seq._ , and we are of the opinion that that reasoning is applicable. Plaintiffs under the Tennessee Consumer Protection Act also act as private attorneys general. The potential award of attorney's fees under the Tennessee Consumer Protection Act is intended to make prosecution of such claims economically viable to plaintiff.

Where a defendant elects to pursue a strategy of delay by erecting hurdles in order to make the cost of litigation prohibitive to the plaintiff, the plaintiff is effectively denied a remedy if the award of attorney's fees is made proportionate to the jury award. A review of the record shows that this was the strategy used by Harpeth. Under the Tennessee Consumer Protection Act, a defendant employs

such a strategy of delay and obstruction at its peril.

*10 Taking all the factors into consideration, including the number of hours expended by the plaintiff's attorney at what is clearly a reasonable hourly rate, the award of $20,004.00 attorney's fees is reasonable.

Defendant argues that the attorney should not receive one-third of the recovery and the award of attorney's fees. The award of attorney's fees by the court in this case is in lieu of one-third of the plaintiff's recovery. Plaintiff's attorney will not receive, in addition to the $20,004.00 awarded by the court, one-third of the plaintiff's recovery.

This issue is without merit.

By its next issue, Harpeth questions "[w]hether the trial court erred in issuing a permanent injunction against Harpeth pursuant to the Tennessee Consumer Protection Act."

Tennessee Code Annotated § 47-18-109(b) provides in pertinent part as follows:

(b) Without regard to any other remedy or relief to which a person is entitled, anyone affected by a violation of this part may bring an action to obtain a declaratory judgment that the act or practice violates the provisions of this part and to enjoin the person who has violated, is violating, or who is otherwise likely to violate this part; provided, however, that such action shall not be filed once the division has commenced a proceeding pursuant to § 47-18-107 or § 47-18-108.

That part of the trial court's order relating to the injunction is as follows: "It is further ORDERED that defendant Harpeth Ford-Mercury, Inc. is permanently enjoined from future violations of the Tennessee Consumer Protection Act, Tenn.Code Ann. § 47-18-101 et seq."

We are of the opinion that the record in this case does not support an all-encompassing injunction such as that issued. The evidence shows there was a violation of Tenn.Code Ann. § 47-18-104(b) (12). We are, therefore, of the opinion that the injunction should be modified to permanently enjoin Harpeth Ford-Mercury, Inc. from future violations of Tenn.Code Ann. § 47-18-104(b)(12): "Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law."

In all other particulars the judgment of the trial court is affirmed and the cause is remanded to the trial court for the entry of an order modifying the injunction and in all other respects for the implementation of its judgment. Costs are taxed to the defendant, Harpeth Ford-Mercury, Inc.

CANTRELL, KOCH, JJ., concur.

FN1. Kelley v. Metropolitan County Bd. of Educ., 773 F.2d 677 (6th Cir.1985), cert. denied, 474 U.S. 1083, 106 S.Ct. 853 (1986); Northcross v. Board of Educ. of Memphis City Schools, 611 F.2d 624 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999 (1980); McCullough v. Cady, 640 F.Supp. 1012 (E.D.Mich.1986).

Tenn.App.,1991.
**Adkinson v. Harpeth Ford**-Mercury, Inc.
Not Reported in S.W.2d, 1991 WL 17177 (Tenn.Ct.App.)

---

Judges and Attorneys (Back to top)

Judges | Attorneys

Judges

- **Cantrell, Ben H.**
<u>Litigation History Report</u> | <u>Judicial Reversal Report</u> | <u>Profiler</u>

- **Clark, Hon. Cornelia A.**
State of Tennessee Supreme Court
Tennessee
<u>Litigation History Report</u> | <u>Judicial Reversal Report</u> | <u>Judicial Expert Challenge Report</u> | <u>Profiler</u>

- **Koch, Hon. William C. Jr.**
State of Tennessee Supreme Court
Tennessee
<u>Litigation History Report</u> | <u>Judicial Reversal Report</u> | <u>Judicial Expert Challenge Report</u> | <u>Profiler</u>

- **Lewis, Samuel L. Hon.**
State of Tennessee Court of Appeals, Middle Grand Division
Tennessee
<u>Litigation History Report</u> | <u>Profiler</u>

---

Attorneys

Attorneys for Defendant
- **Conway, William Carter**
William Carter Conway
Franklin, Tennessee
<u>Litigation History Report</u> | <u>Profiler</u>

- **Whaley, Kimberly K.**
Current Firm Information Unknown
<u>Litigation History Report</u> | <u>Profiler</u>

Attorneys for Plaintiff
- **White, James W.**
Current Firm Information Unknown
<u>Litigation History Report</u> | <u>Profiler</u>

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.